## GUEST v. GUEST.

### No. 15171.

Court of Civil Appeals of Texas. Fort Worth.

Nov. 10, 1950.

On Motion for Rehearing Dec. 22, 1950.

Rehearing Denied Jan. 19, 1951.

B. Ray Smith and Homer C. Ellis, both of Paris, for appellant.

Moore & Moore, of Paris, for appellee.

SPEER, Justice.

George M. Guest, of the Negro race, age about 85 or 86, died in Lamar County, Texas, on November 1, 1948. On June 3,

1948, he purportedly executed a joint will with his second wife, Adlanta Guest, to whom he had been married fifty-three years. By the terms of the instrument his named wife was nominated as independent executrix. Shortly after the testator's death, the wife made application to the probate court to have the will admitted to probate and for record. There is no question raised going to the sufficiency of the application.

Robert Guest, a son of testator by a former marriage, which had been dissolved by divorce many years ago, filed and vigorously prosecuted a contest of the proposed will. Grounds relied upon consisted of eleven typewritten pages of very elaborate allegations, which for brevity may be summarized by saying he raised the questions of (1) want of testamentary capacity; (2) forgery; (3) improper or illegal execution of the will; (4) undue influence; and (5) fraud.

We shall refer to the parties as proponent and contestant as is most frequently done in the record.

The will was admitted to probate and contestant appealed to the district court, where trial was had to a jury on special issues. Upon what the court found to be uncontroverted facts and the verdict of the jury, judgment was entered for probate of the will. The order was certified to the probate court for observance. Contestant has appealed on his affidavit of inability to furnish bond.

The record and briefs are voluminous. The statement of facts alone contains more than one thousand pages, much of which is in narrative form. To analyze all would require an opinion of unusual length and would prove of little benefit to the bench and bar. We shall content ourselves to dispose of this appeal in a manner which in some instances will only be understood by those who participated in the trial.

The proposed will covers more than seven pages in the record. It is sufficient for us to say that it was carefully and meticulously drafted by an attorney and disposed of an estate estimated by some witnesses of a value between $100,000 and $150,000. There are three personal bequests of $1,000 each and one for $500. There is a bequest of $10,000 to "First Circle of The King's Daughters of Paris, Texas," for the purpose of purchasing a site and erecting a building as a day nursery for Negro children, to be known as the "Geo. M. and Adlanta L. Guest Day Nursery." A life estate in the remainder is given to the wife Adlanta, with privileges of sale and disposition of same by her. There is a declaration that neither the husband nor wife had any separate property but that all property was community. After the life estate to the wife is terminated, a trust was created, naming a local bank as trustee with specific instructions as to its duties and obligations to handle the residue of the estate and to pay to "The King's Daughters," a corporation, or its successors, the net revenue derived by the trustee from the estate and directing The King's Daughters to enlarge, equip and maintain said nursery therefrom.

The court submitted special issues with explanatory definitions, from which the jury found that (1) the propounded will was signed by testator or some person under his direction and in his presence; the first issue was followed by this explanation: "In connection with this question you are instructed that a will can be signed by mark made by the maker of the will or by his touching the instrument of writing as the mark is made." (2) George M. Guest had testamentary capacity, as that term is defined by the court, at the time the propounded instrument was executed. In connection with the second issue the court gave this explanation: "In answering Question No. 2, you are charged in connection with the term 'Testamentary capacity', that a person, to have testamentary capacity, as that term is used in this charge, is meant that such person at the time of the execution of the will, must have had sufficient mental ability to understand the business in which he was engaged, the effect of his act in making the will, and the nature and extent of his property; he must be able to know his next of kin and the natural objects of his bounty and their claims upon him; he must have memory sufficient to collect in his mind the elements of the busi-

ness about to be transacted and to hold them long enough to perceive at least their obvious relation to each other and to be able to form a reasonable judgment as to them." (3) The instrument proposed has not been revoked; and (4) subject to an affirmative answer No. 2, the instrument was not procured by undue influence.

Contestant relies upon twenty-four points of assigned error, some of which relate to arguments made to the jury by proponent's counsel. We have concluded that certain of those points are well taken and require a reversal of the judgment before us. We shall later discuss them. Some other points before us will no doubt arise at a subsequent trial and for the guidance of the court at such trial we shall mention them.

Both sides requested peremptory instructions; both were properly refused by the court; there were certain material issues raised by the testimony for the jury's determination.

Contestant's first point challenges the court's denial of his request for an instructed verdict, and points two, six, seven, nine and ten assert as many reasons why, from the record, his request for a peremptory instruction should have been granted. These contentions embraced such as, there was testimony that testator had not signed the purported will prior to the signing by one of the attesting witnesses; error in permitting a subscribing witness to testify that testator signed by his mark when the will recited he *signed* his name thereto; the form of the first special issue inquiring if testator signed the will or if it was signed by some other person at his direction and the explanation above quoted in connection with that issue.

■ We think it a strained construction of the testimony to say that there was evidence that testator had not signed the instrument when one of the witnesses signed. True, testator did not physically sign his name at all. In any event, there was testimony by the other subscribing witness that testator could not sign his name and had touched the instrument with which his mark was made and instructed the witness to write his name before either subscribing witness attested the instrument. There could have been no more than a conflict in the testimony and the jury resolved it (as it had a right to do) in favor of proponent.

All of the foregoing contentions of contestant apparently were based upon the theory that a will could not be executed by testator making his mark in lieu of a genuine signature, and further because the instrument recited that testator had "hereunto signed" his name thereto. There were allegations that testator could not sign his name at the time because of a previous "light stroke."

■ The language of Article 8283, Vernon's Ann.Civ.St., has been construed to mean that a will may be executed by a testator who is unable to write his name, by making his mark and instructing some other person to write his name. Short v. Short, Tex.Civ.App., 67 S.W.2d 425; Franklin v. Martin, Tex.Civ.App., 73 S.W.2d 919; Saathoff v. Saathoff, Tex.Civ.App., 101 S. W.2d 910, writ refused; Mortgage Bond Corp. v. Haney, Tex.Civ.App., 105 S.W.2d 488, writ refused. Under the cited authorities we overruled the points of error under discussion.

■ If, as contended by contestant under his fifteenth point, testator did not sign or make "his mark" in the presence of or prior to attestation by one of the witnesses, the instrument would not be denied probate on that account alone. Ludwick v. Fowler, Tex.Civ.App., 193 S.W.2d 692, 694–695, error refused, n. r. e.

Another group of assignments complain of the court's refusal to submit requested issues, the substance of which would have inquired if testator "signed" the proposed instrument; did he make the mark designated thereon as "his mark"; did testator have full knowledge of the contents of the instrument, and did he intend that it should be his will.

■ The findings of the court from undisputed facts and the verdict on the submitted issues furnished proponent the requisites set out in Article 3348, V.A.C.S. To have submitted the requested issues would have been a repetition, in effect, of

what the court did submit and were properly rejected.

There are complaints of the court's exclusion of parts of oral depositions taken before the date of trial under stipulations that either party could urge objections to their admissibility when offered in evidence. Based upon the objections made at the time parts of the proposed depositions were offered, we hold that they were properly excluded.

We think the parts of the testimony of proponent not objectionable under Article 3716, as complained of under point eight in contestant's brief.

██ Points sixteen to twenty-four complain of arguments of proponent's counsel while presenting the case to the jury. It is needless to repeat here what our courts have so many times said about the privilege of counsel to make their own deductions from the testimony, even though such deductions be illogical or improbable. The question was discussed by this court and authorities cited in Whitten v. Dethloff, Tex.Civ.App., 214 S.W.2d 480, 486. However, there are limits beyond which attorneys may not go in arguments to the jury. When arguments go to matters outside the realm of the testimony and furnish information to the jury which it did not otherwise have and it is calculated to and probably did affect the verdict of the jury, reversal must follow. Whether or not such arguments probably affected the verdict is a question of law and is reviewable on appeal. White Cabs v. Moore, 146 Tex. 101, 203 S.W.2d 200. Certain of the arguments complained of were well within legitimate inferences and deductions of counsel from the testimony and will receive no further comment from us.

Points sixteen, twenty-one, twenty-two and twenty-three complain of arguments shown by approved bills of exceptions to have been timely objected to and requests for instruction to the jury not to consider same, and overruled and refused by the court, which when taken as a whole we conclude are violative of our rules of procedure, were calculated to and probably resulted in a verdict which, but for such

arguments, might have been different. It is often difficult to say with certainty what questionable arguments affect verdicts. We do know, however, that in this case the verdict was against contestant on all issuable facts. In the absence of any testimony upon which to base them, we are unwilling to approve the arguments here complained of. They came from an attorney who prepared and witnessed the will in controversy; he is shown to have been born and reared in Paris, Texas, where the trial was being held. Objections and requests to instruct the jury not to consider were made at the time and were based substantially upon the absence of testimony relating to the matters commented upon, effectively placing new and independent evidence before the jury not produced from the witness stand, and coming from counsel who was reared in that city and had a career of long standing before the Lamar County bar and the people of that community.

██ Objectionable arguments in the order of the points above mentioned were as follows:

(16) "Gentlemen, all we have to do in this case is to show that George Guest had testamentary capacity and then the burden shifts to contestant upon all other matters involved in this suit."

(21) "Gentlemen of the jury there is nothing peculiar or uncommon about the facts and conditions under which this will was made. *Wills are frequently made under such conditions and circumstances, and held to be valid.*" The emphasized sentence was objectionable.

(22) "Gentlemen of the jury, this is the first time in the history of Paris, that a person belonging to the negro race has ever made a substantial philanthropic contribution to the Kings Daughters organization, and you should try to uphold it with your verdict."

(23) "It is not unusual for a lawyer to prepare a will and also to be witness to it. That is the custom among lawyers everywhere."

Appellate courts find no pleasure in reversing judgments of trial courts and requiring new trials in cases of this character,

which obviously are expensive, consume many days of labor of the court, attorneys, jurors and witnesses. All trials must be conducted within proper bounds prescribed by the law. Appellate courts may not whittle down the well prescribed rules by which such trials are conducted and lend sanction to arguments of counsel which have been so frequently condemned.

In Woodard v. Texas & P. Ry. Co., 126 Tex. 30, 86 S.W.2d 38, 40, the court said in part: "Attorneys must come to understand that so far as this court may have jurisdiction to do so, the rules with reference to the orderly, fair, and impartial trial of causes, as regards argument of counsel, conduct of jurors, and the substantial methods of procedure, will be consistently enforced. * * * If attorneys persist in seeking to obtain verdicts of jurors by resorting to arguments such as is hereinabove set out, when they may safely intrust their causes to the jury upon the evidence and the charge of the court, commented upon in a fair and reasonable manner, they have no one to blame but themselves when a reversal is ordered by this court."

There is yet one other assignment of error presented by contestant's fourth point, which deserves attention. In view of the whole record before us, we are not saying that we would reverse this judgment on point four alone. It is to be hoped that the proceedings there detailed will not occur again. By a partially qualified and approved bill of exception, a rather lurid picture is presented of the courtroom scenes at recess intervals in the presence of the jury. We quote from the bill of exception: "Be it remembered that, upon the trial of the above styled cause to and before a jury, several members of the Kings Daughters organization, surrounded with, and accompanied by, various of their women associates, regularly during the Court's recesses and in the presence of and before the jury would have vacated their seats, converged en masse around proponent and her counsel and went through a routine of hand-shaking, back-slapping and other forms of well-wishing." It is disclosed by the bill that contestant's attorney in open court following each of such demonstrations objected and excepted

for various and sundry assigned reasons and moved the court to instruct said women to desist from additional exhibitions of the nature complained about and to admonish the jury not to consider those demonstrations theretofore made for any purpose. The court approved the bill of exception with the following qualification: "On various occasions during the trial several ladies were in the court room. During recess of court an undetermined number of them talked with proponent and her counsel. During the trial court recessed several times some of which were quite lengthy."

It is needless to say that trials of this character involve serious matters of material interest to the respective litigating parties and that trials should be conducted by the presiding judge in an orderly manner and to protect the jury as far as possible from outside influences. It is a matter of common knowledge to all courts that in such cases as this where jurors are not kept together under order of the court, it is a matter of physical impossibility for the court to prevent persons rightfully entitled to be present in the courtroom from conversing with litigants and attorneys at recess periods. But we think that where it becomes obvious that partisans are either purposely or inadvertently abusing that privilege of communicating with the parties in the courtroom in order to influence the jury he should prevent it as far as is reasonably possible. Demonstrations of partisans during pending litigation in the presence and hearing of the jury were condemned in no uncertain terms in Owens v. State ex rel. Jennett, 64 Tex. 500; Vogt v. Guidry, Tex.Civ.App., 229 S.W. 656, 658.

For the reasons shown, we sustain points of error 16, 21, 22 and 23 relating to arguments of opposing counsel. All other points of error are overruled and the judgment of the trial court will be reversed and the cause remanded for another trial not inconsistent with our holdings herein. Reversed and remanded.

## On Motion for Rehearing

When we wrote our original opinion in this case we knew that appellee proponent was insisting that the trial court should

have given her requested peremptory instruction. If correct in that contention the assigned errors for improper argument would become unimportant. We studied the lengthy record and concluded that the evidence on testator's mental capacity was conflicting and presented a jury issue. To avoid an opinion of excessive length, we simply said as much without an attempt to point out the testimony. But in this, his last court opinion, it now appears that this writer had little success.

 In a fifty page motion for rehearing, appellee vigorously insists that there was no testimony of probative value tending to show testator's lack of testamentary capacity to execute the proposed will. Since filing the motion, Chief Justice McDONALD has filed an expression of doubt that there was sufficient testimony to require the submission of that issue to the jury. The majority feels impelled to point out some of the testimony which we believe justifies our former holding in this respect.

Article 3348, R.C.S., places the burden of proof upon proponent to establish, among other things, that testator was of sound mind when he made the will. It is unnecessary to do more just here than to cite Texas Employers' Insurance Association v. Ferguson, Tex.Civ.App., 196 S.W.2d 677, writ refused, n. r. e., and cases there collated, to show when a peremptory instruction is justified. In view of the age of testator, his marital relations, a son by a former marriage, his often-expressed love and affection for his son, the length and complicated character of the proposed will, which at least was rather unusual, we think the conflicts in the testimony as to testamentary capacity should not have been treated so lightly as to give the requested peremptory instruction. The trial court viewed the testimony as sufficient to raise a jury issue, overruled the motion, and submitted the issue. The jury answered the issue favorable to proponent and there was plenty of evidence to support the verdict. That, however, is not the test on this motion for rehearing. The fact that the jury resolved the conflicting testimony one way or the other on competent testimony does not mean that there was no competent testimony to the contrary.

Referable to testator's mental capacity to make the proposed will, some of the dates are confusing but as we view the conflicts they are not especially material. There is no substantial conflict concerning the matters controlling this appeal. Without conflict, the testimony shows that testator was a good and prosperous colored man, eighty-five or eighty-six years of age. On about May 18 or 19, 1948, he suffered a stroke which affected his right arm, hand and side of his face and eye, to the extent of fifteen or twenty per cent. The stroke likewise affected his speech until it was difficult to understand all he attempted to say. He saw Dr. Perkins on May 19 and the doctor said he had suffered a light stroke. It will be remembered that Dr. Perkins witnessed the will on June 3, 1948, and said that he was then of sound mind. Several other witnesses testified to the same effect. Dr. Perkins again saw testator on June 2, 1948 (the day before the will was executed), when he came to the clinic and was assisted into the office but walked without aid across the room. Testator complained of slowness and difficulty of urination. The doctor said his bladder was distended and his prostate enlarged to three times its normal size. He gave the patient three mild sedatives, to "allay his anxiety and to put him at peace." The doctor discussed with testator the calling of a consultant urologist and told the patient he would see him next day. On June 3, 1948, Dr. Perkins saw testator and found that his urine had completely stopped since he had seen him on the preceding day. On June 3, 1948, testator was taken to the sanitarium where the urologist late in the afternoon extracted his urine by means of a catheter, using a local anaesthetic. Testator was then taken back to his home where the will was executed later that evening.

Dr. Perkins said he found an atrophy or wasting away in testator's body and that his limbs were shaky and his speech impaired. He also said that the excessive retention of one's urine may produce uremia

and that uremia could affect the mind. There was other testimony to the effect that the symptoms Dr. Perkins found in testator were common to paresis but Dr. Perkins said he did not have paresis. Testator was taken to the clinic on June 7 and to the General Hospital on the 14th, was operated for prostate a few days later and sent home on July 20, where he died on November 1, 1948.

Dr. Perkins made the death certificate showing cause of death, primarily, uremia, 2 days' duration, contributory causes, apoplexy, 5 days' duration, and general visceral failure.

Several witnesses testified during the long drawn out trial under rulings of the court, to the effect that testator's mind was not sound over the period between the date of his stroke and the date of his death. We shall summarize these statements since they vary in degree.

Homer Preston said he would not say testator was of sound mind at all times during the last year of his life.

Walter Thompson testified that when he took testator to the hospital on June 14, 1948, it took three men to get him into and out of the ambulance. He related testator's several physical defects resulting from the stroke and his constantly failing strength and added, "I imagine his mind failed some too." That his mind was good before he took sick, that is when he had the stroke, after the stroke his mind was not so good. "I have doubts that his mind was good."

Ruben McDonald was closely associated with testator and said in effect that after the stroke he knew testator did not have a good mind and added, "I mean his mind wasn't sound."

Velma Ward said he knew in the last year of testator's life he was in "senility."

Walter Wells, who detailed his frequent association with testator, saw him while he was in Dr. Perkins' clinic and said he knew testator did not have a good mind and he was a different man from what he was before the stroke.

Dr. Miller testified by deposition that he was a physician and a long-time friend of testator and visited him frequently while he was in the hospital, that his visits were friendly ones and not professional, and in answer to a hypothetical question, hotly contested by proponent but approved by the trial court, said that: "In my opinion he could have had paresis," and based upon the same hypothetical question said: "In my opinion he was of unsound mind."

Dr. Witt, a psychiatrist of Fort Worth, testified by deposition, taken of course prior to the time of trial, among other things in response to the following question: "Dr. Witt, is it possible for a man to have a stroke which affects his speech and facial muscles on one side without his mental processes being impaired?" and answered: "It is possible but not probable."

From the extracts gleaned from this great volume of testimony, largely written in narrative form, we are still of the opinion that the evidence as to testator's testamentary capacity was an issue properly submitted to the jury for determination.

Appellee's motion calls to our attention two erroneous statements made by us in our opinion in this case, and in the interest of clarity she is entitled to have them corrected for whatever they may be worth.

■ In our opinion, while discussing alleged improper argument, we mentioned that the objection went to the placing of new and independent evidence before the jury and added "and coming from counsel who was reared in that city and had a career of long standing before the Lamar County bar and the people of that community," and in another place while referring to the arguments complained of, we said, "They came from an attorney who prepared and witnessed the will in controversy; he is shown to have been born and reared in Paris, Texas, where the trial was being held." The facts in this record reveal that the law firm of Moore & Moore represented appellee; that the senior member, W. F. Moore, is the father of the junior member, Hardy Moore; that Hardy Moore was born and reared in Paris, Lamar County, Texas, and is the member of the firm who wrote the will and witnessed it. The record as a whole reflects that Honorable W. F. Moore and not Honorable Har-

**718**

dy Moore made the arguments complained of and that the objections to the arguments as made, in addition to those contained in the opinion, to quote from the bill of exception, were: "It was impossible for such statements coming from a person of Mr. Moore's age and long standing before the Lamar County Bar not to have greatly influenced the jury in its answer to the question submitted to them by the court." This court will take judicial knowledge of the fact that Judge W. F. Moore, of Paris, Texas, was at one time Chief Justice of the Supreme Court of this State, and it is fair to assume that the jurors also knew this to be true. It suggests to us that the reference made to him, his age and long standing before the Lamar County Bar and in that community specially emphasized the harmful effects of the argument complained of.

We withdraw from the opinion the two quoted extracts above pointed out and substitute therefor what is here said.

We cheerfully make these corrections so that the opinion will properly reflect the situation complained of. However, we do not consider that anything we have said in this connection alters or changes the result reached in the original opinion.

▆▆▆ Appellant contestant has filed what he terms a motion to procure a reformation of this court's judgment and asks that we file findings of fact and conclusions of law respecting the various points of error assigned by him in his brief, which we, in the original opinion, overruled without elaboration thereon. We overruled point eight which complained of a violation of the rule under Article 3716, R.C.S., for the reasons, first, because there was no real dispute between the parties as to the time proponent and testator were married, and, second, because there was other competent testimony substantially to the same effect.

In view of what we have said in these conclusions, and with the corrections shown, we overrule both motions.

McDONALD, Chief Justice.

Although I have not dissented from our order reversing the judgment of the trial court, I doubt if we have made a correct disposition of the appeal. As shown in Justice SPEER'S opinion, the reversal was ordered because of portions of the argument of appellee's counsel to the jury.

Four issues were submitted to the jury, but there was no dispute in the evidence as to three of them. The only issue about which there could possibly be said to be any dispute in the evidence was the issue inquiring as to testamentary capacity of the testator. Appellee argued at great length in her brief, and again in her motion for rehearing, that the undisputed evidence showed testamentary capacity, as was found by the jury, or, to put it another way, that there was evidence of testamentary capacity and no evidence of probative value tending to show lack of testamentary capacity, and that any error in the argument of counsel should be treated as harmless, because the verdict was the only one which the jury could properly have returned under the evidence.

A number of witnesses testified that the testator was of sound mind. There were only two witnesses, if any, whose testimony could be said to have raised an issue as to testamentary incapacity. One of them, a physician, gave it as his opinion in answer to a hypothetical question that the testator was of unsound mind. The opinion had no probative value because two important facts were stated in the hypothesis which were not shown by the evidence, to-wit, that the testator had paresis and that he suffered a paralytical stroke on the day the will was signed. Not only was there no evidence tending to show these two facts, but the undisputed evidence was to the contrary. The other witness, a layman, after giving in detail the facts upon which he based his opinion, finally stated, after much questioning and with seeming reluctance, that he was of opinion that the testator was of unsound mind on the day the will was signed. It is often difficult to say whether there is more than a scintilla of evidence of a fact, such as to raise a jury issue, but when the testimony of this witness is examined as a whole, it is hard to believe that it should be treated as having any probative value.

The recitals of the judgment, as well as statements made by counsel in the oral ar—

gument before us, indicate that the trial of this case consumed a period of twenty-one days. Much testimony was taken. As has been said, numerous witnesses testified that the testator was of sound mind. The jury found that he was of sound mind, and I am unable to see how a jury of reasonable men could have found otherwise on the evidence in the record. But if I am mistaken about this, I doubt if there is a reasonable basis for believing that the remarks of counsel, which I shall relate, probably caused the jury to return a verdict other than the verdict it would have returned if the remarks had not been made.

One of the complained of remarks was: "Gentlemen, all we have to do in this case is to show that George Guest had testamentary capacity and then the burden shifts to contestant upon all other matters involved in this suit."

Granting that the remark erroneously stated the law, it could not have affected the verdict. The remark correctly stated the rule on burden of proof as to the only special issue about which there was any dispute in the evidence, to-wit, the issue inquiring about testamentary capacity. The erroneous portion of the remark, even if believed by the jury, could not have affected their verdict, and a reversal is not warranted because of an error that is harmless. Rule 434, Texas Rules of Civil Procedure.

Another complained of remark was: "Gentlemen of the jury there is nothing peculiar or uncommon about the facts and conditions under which this will was made. Wills are frequently made under such conditions and circumstances, and held to be valid."

I do not see how this remark could have affected the finding on testamentary capacity. The jury was not asked to make a finding as to the validity of the will. Considering the quoted remark against the background of the entire record, it is likely that the remark was made in reference to the fact that the will was signed with a mark instead of the original signature of the testator. It is true that the jury was asked if the testator made his mark, but the evidence was undisputed that he did.

Some of what has just been said applies to the remark: "It is not unusual for a lawyer to prepare a will and also to be a witness to it. That is the custom among lawyers everywhere."

This remark had no bearing on the question of testamentary capacity, and I doubt if we should say that it probably affected the verdict.

The other remark of which complaint is made was: "Gentlemen of the jury, this is the first time in the history of Paris, that a person belonging to the negro race has ever made a substantial philanthropic contribution to the Kings Daughters organization, and you should try to uphold it with your verdict."

The remark was out of the record, and cannot be justified, but the question in my mind is whether it should be called a reversible error. The requirement of Rule 434 is that a judgment shall not be reversed unless the appellate court shall be of the opinion that the error complained of amounted to such a denial of the rights of appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case, or, to reduce it to the terms of the present situation, that the error was such as was reasonably calculated to cause and probably did cause the rendition of a verdict otherwise than as would have been rendered. We have done away with the rule of presumed harm with respect to jury argument, and are required to consider the argument in the light of the entire record. We will give consideration to the fact that a verdict is based on conflicting evidence, or is against the weight of the evidence, or is in accord with the great weight of the evidence, in determining the likelihood of harm having been caused by the offending argument. The offending argument will also be considered in the light of its applicability to the issues submitted to the jury for their answer. A judgment will not be reversed simply because of infraction of the rules, whether pertaining to jury argument or to something else, but only because of an infraction that probably was harmful. The mere fact that the verdict was adverse to

**720**

appellant does not prove that an alleged error was harmful. The question always is whether or not the alleged error was probably what brought about the adverse verdict. In determining the last question the appellate courts must necessarily exercise some degree of discretion, perhaps drawing upon their own observations and experiences as trained lawyers and members of the judiciary, and often comparing the situation under review with situations described in the reported opinions of appellate courts in other cases.

For twenty-one days the jury heard this case. The evidence in favor of testamentary capacity was overwhelming, if not undisputed. It is difficult to believe that the jury was influenced to reach its decision on testamentary capacity, under the circumstances presented by the record, because of the single utterance of counsel above quoted. I am afraid that we have reversed the judgment for an insubstantial reason, and that substantial justice has been defeated by too strict an application of procedural rules.