**Joan Ann MUHLBAUER, Appellant,**

v.

**Maureene Lee MUHLBAUER, Independent Executrix of Estate of John E. Muhlbauer, Appellee.**

**No. 2–84–145–CV.**

Court of Appeals of Texas, Fort Worth.

Feb. 28, 1985.

Jonasue Ammons, Hurst, for appellant.

Law Office of Don Driver, Don S. McDaniel, Fort Worth, for appellee.

Before JOE SPURLOCK, II and HILL, JJ.

## OPINION

JOE SPURLOCK, II, Justice.

This appeal is from a contest in the probate court in which the court denied the

probate of a purported will. The appellant, Joan Muhlbauer, is the surviving spouse of the deceased, John Muhlbauer. The appellee, Maureene Muhlbauer, is the daughter of the deceased and step daughter of appellant.

In December of 1970, John Muhlbauer executed his first will leaving his estate to his three children. He was unmarried at that time. In August of 1976, he married the appellant and remained married to her until his death. It is alleged that he executed a second will in January 1979 in which he revoked any prior will and designated appellant as the primary beneficiary, with his estate to be divided equally between his three children and her four children should she not survive him. Upon his death, appellee filed the 1970 will for probate and the probate court admitted the will to probate. Appellant filed her contest later along with her application for probate of the 1979 will. After trial on the contested issue, the court ruled that the 1979 will had not been executed with all of the formalities and solemnities required by the code and declined to accept the 1979 will for probate. From that order, this appeal was taken. For reasons stated hereinafter, we affirm.

Appellant, in eleven points of error, complains that the trial court committed error in its ruling. The points of error are not in such form, nor with such particularity as to actually advise this court of the error committed by the trial court below. We believe that appellant is attacking an implied finding made by the court that appellant's evidence was insufficient to admit the will to probate, i.e. that the court's ruling is against the great weight and preponderance of the evidence.

In her first two points of error, appellant complains that the judgment of the trial court should be reversed and rendered in her favor as the court committed error in entering a judgment refusing to admit the 1979 will to probate by finding that the same was not signed with all the formalities and solemnities required by sec. 59 of the Texas Probate Code and because the

court found that the testator did not request assistance in signing the will as required by that same section. Her third and fourth points of error discuss the testimony at trial and argue with the court's finding in that regard. Her fifth point of error is that if this court finds the evidence inconclusive, then the fact that one of appellant's witnesses' memory failed him should not have lead to the conclusion of the trial court that it deny the 1979 will. It would add nothing to the jurisprudence of the State of Texas to discuss appellant's remaining points of error.

■ It is clear that the burden was on the appellant, as proponent of the instrument offered for probate, to prove the execution of a valid will. *See Mossler v. Johnson*, 565 S.W.2d 952, 957 (Tex.Civ.App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.) and *In re Estate Rosborough*, 542 S.W.2d 685, 688 (Tex.Civ.App.—Texarkana 1976, writ ref'd n.r.e.). When a party having the burden of proof appeals from an adverse fact finding in the trial court, the point of error should be that the matter was established as a matter of law, or that the court's finding was against the great weight and preponderance of the evidence. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). We construe appellant's points of error as asserting that the court's ruling in the present case was against the great weight and preponderance of the evidence.

The matter was tried before the court without a jury and after trial there was no request made for findings of fact or conclusions of law. The court did comment upon the evidence at the time it made the order in this case, and the record of testimony together with the court's comments are before us.

■ In a trial to the court where no findings of fact or conclusions of law are filed or requested, the judgment of the trial court implies all necessary findings of fact in support thereof. *Burnett v. Motyka*, 610 S.W.2d 735, 736 (Tex.1980). These implied findings may be challenged by "no evidence" and "insufficient evidence" points and where such points are raised,

the standard of review to be applied is the same as that to be applied in the review of jury findings or a trial court's findings of fact. *Id.*

■ Where the challenge to a finding is framed as an "insufficient evidence point," we are to consider all the evidence, both that in support of and contrary to the challenged finding, to determine if the finding is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951); *City of Lubbock v. South Plains Electric Cooperative, Inc.,* 593 S.W.2d 138, 143 (Tex.Civ.App.—Amarillo 1979, writ ref'd n.r.e.).

■ Where the implied findings of fact are supported by the evidence, it is the duty of the appellate court to uphold the judgment on any theory of law applicable to the case. *Lassiter v. Bliss,* 559 S.W.2d 353, 358 (Tex.1977); *Ellis v. Waldrop,* 627 S.W.2d 791 (Tex.App.—Fort Worth 1982), *rev'd on other grounds,* 656 S.W.2d 902 (Tex.1983). This is so regardless whether the trial court articulates the correct legal reason for the judgment. *Gulf Land Co. v. Atlantic Refining Co.,* 134 Tex. 59, 131 S.W.2d 73, 84 (1939); *Rheiner v. Varner,* 627 S.W.2d 459, 462 (Tex.App.—Tyler 1981, no writ).

The particular question in this case revolves around the interpretation of the statute in question. TEX.PROB.CODE ANN. sec. 59 (Vernon 1980). This statute provides in part as follows:

> Every last will and testament, except where otherwise provided by law, shall be in writing and signed by the testator in person or by another person for him by his direction and in his presence, ...

The language of this statute "has been construed to mean that a will may be executed by a testator who is unable to write his name, by making his mark and instructing some other person to write his name." *Guest v. Guest,* 235 S.W.2d 710, 713 (Tex. Civ.App.—Fort Worth 1950, writ ref'd n.r. e.).

In the case on trial, appellant attempted to show that the testator executed the will in her presence and that she, at his request, placed her hand over his and guided his hand in making his signature to the will in question. At the trial, she called the attorney who had prepared the will and who also signed the same as a witness in her presence and in the presence of the testator. She also called the law partner, at that time, of the attorney who prepared the will, who appeared and testified as a witness to the execution of the will. In considering this case and in considering whether or not there was sufficient evidence for the court to have concluded that the request was not made by the testator and at his direction, it is necessary that we review portions of the testimony. This testimony gives the background necessary to understand fully the circumstances and facts of this case. During the trial, the attorney who prepared the will and who signed as a witness was called and examined as follows:

[By counsel for appellant]

Q. At or about the time of the execution of the 1979 will could you tell me the approximate physical condition as it appeared to you of Mr. Muhlbauer?

A. Well, I only drafted one will for him. So, the will in '79, he was in a wheel chair and to the best of my memory his hands, I don't know if they shook. He didn't have all of the control that I have, for example. But mentally there was no question. He was in excellent shape. He knew exactly what he wanted.

Q. Do you remember the exact ceremony of execution?

A. The what?

Q. When the 1979 will was executed do you remember that exact day?

A. I remember what happened, with him signing the will because my concern was could he even sign his name.

Q. Were you physically—Were you concerned with his physical condition as to whether he could mechanically move his hand to sign—

A. That was my only concern, mechanically, if he could execute it with his own hand.

Q. Uh-huh.

A. And he did.

Q. When you were present at that execution ceremony did you sign as a witness on that will?

A. Yes. I did.

Q. Mr. Foster, I'd like to ask you to review what has been marked as Applicant's 1, and would you please tell me if you can identify it?

A. Yes. This is the will that I drawed —drafted. It's my signature.

Q. Is that your signature appearing in the witness blank?

A. Yes.

From this we can determine that, on the occasion in question, the attorney/witness was concerned that his client would not be able to execute the will in his own handwriting, that is physically, mechanically move his hand. At this time though, the witness testified that the testator did execute it with his own hand. Further direct examination of the witness revealed the following:

Q. Very well. Mr. Foster, I'd like to talk with you about the specific act of signing that document. Do you remember Mr. Muhlbauer having a pen in his hand?

A. Yes. I do.

Q. Can you tell me about that?

A. Well, all I—To the best of my recollection Mrs. Muhlbauer was asked to put her hand on his to steady his hand while he held the pen in his hand and signed it. That was the only concern, could he hold, you know, keep a steady hand.

Q. So Mrs. Muhlbauer guided his hand.

A. Uh-huh.

Q. Was it with his consent that she guide his hand?

A. Yes. I asked her to. If I recall, I said, "Can you"—My main concern was, could he execute the instrument. And he said his hand moved but if we could hold his hand—I don't know if he said, "She would," or what, but we asked her to do it. And I don't remember if he asked her or I asked her.

Q. But it was with his consent.

A. Oh. Yeah. No question about that.

The witness at this time states he is unable to remember whether the testator asked the appellant to guide the hand of the testator or whether he, the attorney, asked her.

Upon cross-examination by the attorney for appellee, the witness was asked to compare the signatures made on the will in 1970 (which was prepared by the same attorney/witness and signed by the testator in his presence) and the signature made on the 1979 will. At that time, the following exchange took place:

[By counsel for appellee]

Q. I'm going to show you what has previously been admitted in probate as the last will and testament of John Edward Muhlbauer.

A. Okay.

Q. It was recorded in volume 1409, page 837. Would you look that over, please?

A. Yes. This is a will that I apparently drafted in 1970.

Q. And is—Are you listed as the notary on that instrument?

A. Yes.

Q. And are you familiar with Mr. Muhlbauer's signature?

A. All I'm doing is I can see it. Yeah.

Q. And as the notary you swore that he signed that in front of you; didn't you?

A. That's right.

Q. And so is that his signature there on that document?

A. I would have to say, "Yes, absolutely."

Q. Does the signature on that document appear to be substantially different from the one on the will dated 1979?

A. I have to put them together because I didn't even remember this will.

Q. Let me show you what has been admitted into evidence as proponent's ex-

hibit number 1 and ask you to compare those two, please.

A. They don't look the same.

Q. All right.

A. It was a different type of pen but it doesn't look like the same writing either.

From this testimony, it is obvious that the attorney/witness/preparer of the wills, believed that the two signatures were not in the same handwriting, although he had been in fact the notary public on the signature made in 1970. The record contains the samples of the two signatures which the witness compared and which the court observed and they are reproduced herein:

This I make and publish as my Last Will and Testament, hereunto signing and subscribing my name this the ___10^{TH}___ day of ___December___, 1970, in the presence of ___Linda J. Whiteley___ and ___James A. Neufeld___ who attest the same at my request.

*John E. Muhlbauer*

JOHN EDWARD MUHLBAUER, TESTATOR

This I make and publish as my Last Will and Testament, hereunto signing and subscribing my name this the ___16^{th}___ day of ___January___, 1979, in the presence of the undersigned witnesses, who attest the same at my request.

*John Edward Muhlbauer*

JOHN EDWARD MUHLBAUER, Testator

---

The cross-examination of the witness continued as follows:

Q. Let me return these to the Court. Now, in 1979, when Mr. Muhlbauer came in to sign the new instrument, did he read that instrument before he signed it?

A. I feel certain he did for the simple reason that I always had them read it before I would let them sign it.

Q. Do you have any independent recollection of this specific occasion where Mr. Muhlbauer actually read the instrument?

A. I have no specific recollection other than I just know my practice. I always did that.

Q. Okay. And to your knowledge this wasn't any different but you don't specifically remember; is that correct?

A. No. No. With all the wills I did, I just know my procedure.

Q. You don't remember one way or the other then.

A. No. I mean, I would have to say, "He did," but I have no specific recollection of it.

Later testimony reveals that the testator was in fact blind and unable to read. The appellant testified that the secretary read the instrument to him one time before he signed it. As regards the particular question required to be answered under sec. 59 of whether or not the testator requested his wife to sign the will at his direction, the witness testified as follows:

[By counsel for appellee]

Q. Why didn't you ask your secretary or one of the other witnesses to hold his hand instead of Mrs. Muhlbauer; do you recall?

A. No. Don, this is the specific circumstance. I just remember that I want to make sure that he was able to sign the will.

Q. All right. And to the best of your memory did you suggest Mrs. Muhlbauer?

A. No. I can't say that.

Q. All right. Did Mrs. Muhlbauer suggest that she hold—be the one to hold his hand—

A. I can't—

Q. —or do you remember?

A. No. I do not remember. In fact, you know, but for him being in a wheel chair I probably wouldn't remember the incident.

Q. And at the time that he made the will do you recall whether or not he made any comments about being angry or upset with his children?

A. No. I don't.

Q. All right. Now let me ask you just one or two more questions about his physical condition. Were you aware that he had M.S.?

A. I don't remember what he had. I'm sure they told me at the time. I would have, I'm sure, known but I don't remember that.

Q. To the best of your memory was he able to walk?

A. I would say, "No." He was in a wheel chair.

Q. All right. And to the best of your memory was he even able to lift his hands or arms up?

A. I can't recall that clearly, Don. I mean, that was my concern, could he even write his name. I remember that.

Q. You didn't happen to tape record the execution of the will, did you?

A. Oh, no. Never did.

After further redirect and cross-examination, the court made the following inquiry of the witness:

BY THE COURT: Mr. Foster, did you—Do you recall if you inquired as to whether the testator could sign his mark or an "X" without assistance?

A. No. I didn't ask him about—It's my memory, I was concerned could he write his name and it was to do with his hand. And I remember that they held his hand.

BY THE COURT: You spoke earlier, if I remember the testimony, that it was at your—and I don't want to put words in your mouth—your suggestion or request that Mrs. Muhlbauer hold his hand.

A. No. I—If I said that—I just remember that it was suggested. I don't remember if I did or—I do not remember the incident that clearly but I remember that—And I can't swear that she held his hand. It seems like she did. This has been a long while ago. But someone held his hand as he—And I believe it was Mrs. Muhlbauer. I mean, that is, if I had to say which, I would say, "Yes." "She did." But—

BY THE COURT: But you can't state of your independent recollection whether it was at his direction that she hold his hand—

A. No way.

BY THE COURT: —or sign his name for him?

A. No way. No. I can't.

BY THE COURT: And you're not sure that she, in fact, held his hand.

A. I believe she did.

BY THE COURT: You do.

A. I believe she did. I will say, "Yes."

BY THE COURT: Very well. Any further question of this witness.

This testimony viewed in its best light is equivocal about who did or did not request that the wife assist the testator, and in fact, whether or not there was a request made for someone to help him. It establishes absolutely that the testator was not given the opportunity to make his mark or an "X" if he were not able to in fact write his name.

There is contained in the record other testimony concerning the circumstances on the day of the signing. The appellant, widow of the deceased, was present at the time of the signing of the alleged will and was called as a witness in her behalf. She testified in part as follows:

[By counsel for appellant]

Q. Do you remember the signing ceremony?

A. Yes. I do.

Q. Who else was present?

A. There was a secretary, a woman, and there was Mr. Foster. And Mr. Deegan was there.

Q. Uh-huh.

A. And the woman who typed up the will, read the will to my husband as he could not read it, himself. And she read it to him and asked him if everything was okay. He said, "Yes." And when it came to the signing of the will, he knew he couldn't sign it. He couldn't pick up the pen so he turned to me and called me and asked me to help him sign the will. And I asked then, I said, "Is it legal for me to help him sign the will?" They said, "Yes, as long as his hand was on the paper, he had the pen in his hand and I guided his hand," which is exactly what I did.

Q. You have seen a copy of the 1970 will, have you not?

A. Yes.

Q. And you have seen the original of the 1979 will.

A. Yes.

Q. There is no question that there is a material difference in signatures.

A. Right.

Q. How do you account for that difference?

A. Because, like I said, I had to help my husband sign the 1979 will so that it would be different from the 1970 will.

Q. Are you saying—

A. I was guiding his hand. He didn't have the strength to guide it himself. I had to guide it so it would be more, you know, the signature definitely would be different.

Q. Did your husband direct you to help him sign the will?

A. Yes. Yes. He looked over his shoulder and called me. I was behind him at the time when they were reading the will and everything.

Q. Did this occur in Mr. Foster's office.

A. Yes.

Upon cross-examination, when appellee's attorney asked about the purported will and the circumstances of the will itself, she answered as follows:

[By counsel for appellee]

Q. All right. Are you the one that brought up the subject of wills?

A. Yes. I am.

Q. Did he inform you that he already had a will?

A. No. He did not.

Q. Were you aware that he had another will?

A. No. I was not.

Q. Now, let me ask you some questions now about the execution of the document dated 1979. When Mr. Muhlbauer signed the name with your hand on his hand, was his hand actually on the pen?

A. Yes. It was.

Q. Did he know he was signing a will?

A. Yes. He did.

Q. How did he know that?

A. It was read to him by Mr. Foster's secretary before he signed the will.

Q. All right. And why did it have to be read to him?

A. He was legalaly [sic] blind.

From this evidence, it seems that the testator, about whom there was no evidence that he had any argument with his own children, was making out a will leaving to his third wife all of his estate, and that he was in fact blind and unable to read the same and that it was necessary that he have his wife guide his hand in order to sign the will. The appellant's testimony shows that the will was read to the testator only once and further reveals:

[By counsel for appellee]

Q. All right. How long had he been legally blind?

A. He had been legally blind for a good many years. I don't know exactly when he was declared legally blind.

Q. All right. He did not actually read the will, himself, did he?

A. No. It was read by Mr. Foster's secretary.

Q. Did he ask any questions about the will after she read it?

A. No. Everything seemed to be satisfactory to him.

Q. How many times did she read it to him?

A. Once.

Q. In the course of the reading did he stop her and ask any questions?

A. No.

Q. Did he ask any questions of Mr. Foster before he signed that will?

A. I don't believe so. I don't remember.

\* \* \* \* \* \*

Q. I'm asking you about the typed up document that you offered for probate.

A. The typed up document was read to him once.

Q. Now, is it your testimony that he was physically unable to sign his name?

A. Yes.

Q. Was he physically able to make a mark?

A. No.

At this point, the attorney for appellee inquired as to other physical characteristics of the testator, especially in regard to his inability to physically make his mark. The testimony by the appellant was as follows:

[By counsel for appellee]

Q. Did he—In 1979 did he smoke?

A. He smoked a pipe.

Q. All right. In 1979, when he smoked the pipe, didn't he use one of his hands to hold the pipe and place it back and forth in his mouth?

A. Yes.

Q. All right. And you're saying that he was able to take a pipe and put it in his mouth and take it out but was not able to make a mark on a document.

A. Right.

Q. And, in fact, he also wore a watch; didn't he?

A. Yes.

Q. And the reason that he wore a watch was so that he could turn his hand up and look at the time, isn't that correct?

A. Only if he held it within a few inches of his eyes.

Q. All right. And how did he do that?

A. He had use of his right arm.

Q. All right. Didn't he sign with his right hand?

A. Yes.

Q. And when he used this right arm what did he do? Did he pick up his left hand and bring it up, the watch up—

A. Yes.

Q. —to his eyes?

A. Yes.

Appellant also testified about other matters that she had assisted the testator with during his life. Some of these instances testified about on cross-examination were:

[By counsel for appellee]

Q. You testified earlier also that you helped Mr. Muhlbauer sign other things; didn't you?

A. Whatever he had to sign. Yes.

Q. For example, all of his life insurance policies.

A. Whatever he wanted changed, which was just one.

Q. Didn't you change several of his life insurance policies to name you as the major beneficiary—

A. He didn't have—

Q. —instead of his—

A. —several.

Q. —children? Would you let me complete my question, "instead of his children?"

A. He didn't have several.

Q. How many did you sign?

A. Two of them.

Q. All right. And in both of those they had previously named his children as primary beneficiaries and you signed his name changing the named beneficiary to you; didn't you?

A. Yes. I did.

Q. And on those instruments did he also hold the pen and you guide his hand?

A. Yes. He did.

In regards to the particular signature on the instrument itself, when asked about the signing the appellant testified as follows:

[By counsel for appellee]

Q. Well, let me ask you one or two questions about that. The document you have before you that has been offered as proponent's exhibit number 1, look at the initials, there, at the bottom of the page. What do they say?

A. "J. M."

Q. And do they appear to you to be signed with a certain flair?

A. No. Not really. Just—

Q. All right. It's your testimony that you made those initials while Mr. Muhlbauer's hand was on the pen.

A. Yes.

Q. All right. And look at page two.

A. Right.

Q. All right. A signature that purports to be John Edward Muhlbauer.

A. Right. That is where my husband and I both signed.

Q. All right. And once again, it's your testimony that you signed this with his name—with his hand on the pen?

A. Yes. I do.

Q. May I ask you a question, please? Why isn't there any squiggles or lack of control or anything like that in the signatures if his hand was also—two hands on the pen?

A. My husband's hand—fingers did not have very much strength. All he did was just rest his hand on there and get the pen between his fingers and let me do the guiding for him.

Q. So it's your testimony that you were able to hold his hand on top of a pen and move his arm and hand and sign a signature like on that document.

A. All I had to do was move his fingers.

At the conclusion of her testimony, the court made the following inquiry of the appellant:

[By the Court]

Ma'am, did I understand you to say that in your opinion Mr. Muhlbauer could not make an "X"?

A. Right.

BY THE COURT: He did not have the sufficient strength with which to write—

A. Right.

BY THE COURT: —a mark of any kind.

A. Right. He had already tried and he couldn't do it.

BY THE COURT: The Court has no further questions.

The other witness to the signing of the will, also an attorney, was called and testified about his recollection of the signing as follows:

[By counsel for appellant]

Q. Do you have any questions as to the certainty of whether that is your signature?

A. No question at all. This is definitely my signature.

Q. Do you recognize any of the other signatures on that page?

A. Yes. I do. I recognize "Charles L. Foster, Jr."

Q. In what capacity is Mr. Foster signing, there?

A. He signed as witness.

Q. So let me ask you again, you do not remember that specific signing ceremony.

A. No. I do not.

\* \* \* \* \* \*

Q. You stated that Mrs. Brown was your secretary.

A. Yes.

Q. Do you recognize her signature?

A. I believe that is her signature. I am certain that is Mr. Foster's. I saw him sign a number of things and that appears to be Virginia Brown's signature.

Q. But you're not certain as to Virginia Brown's signature.

A. I couldn't—I couldn't say with certainty.

Q. Let me see if I understand your practice. Was it your practice to satisfy yourself in your own mind that the testator knew what they were doing?

A. Yes. It was.

Q. Would it have been your practice to sign the will if there were any questions in your mind?

A. If there were any questions in my mind at all, I would not have signed the will as a witness. And by "questions," if I may expound on that, I would say questions as to one's understanding or competency to sign.

Upon cross-examination by appellee's attorney, the witness said in response to questions:

Q. All right. Was this in C.L.'s office?

A. I believe so. I've done one recently and that jogs my memory but I have done more than one in that manner.

Q. All right. The question is, though: Do you remember one in C.L.'s office?

I can't say that I remember—I do not remember this specific one.

Q. All right.

■ The above reproduced testimony is the significant testimony appearing in the record. Upon the conclusion of the testimony by appellant, appellee made a motion that the will not be admitted into probate and the court in granting such motion made the following observation on the record:

The Court can't help but narrow in on a single issue, ... whether or not this will was executed with the formalities and solemnities required by law. And the particular matter that concerns this Court is the very explicit language, 'by his direction'. For the record I would like to state it doesn't say, 'with his acquiescence' or 'at the suggestion of the drafting attorney.' It says, 'by his direction,' meaning the testator's direction.

The court stated further:

Based upon the evidence I've heard this Court feels that the proponent of the 1979 will has failed to carry her burden of proof that it was executed with the formalities and solemnities required by law because this Court does not have sufficient evidence to find that it was signed by another person by the direction of the testator.

We agree with the careful trial court in his assessment of the evidence and of the requirements of the law. There is not much case law in the State of Texas interpreting this particular provision of the probate code. It is clear that the language of the statute is directory in nature and provides only that the will be signed by the testator in person or alternatively only by another for him by his direction and in his presence. The evidence before the court in this case did not establish that fact. Appellant argues that the court should have, if it discounted the testimony of the interested witness, the widow, followed the logic of the Texas Supreme Court in the case of *Massey v. Allen*, 248 S.W. 1067, 1070 (Tex.Comm'n. App.1923, opinion adopted), where the court observed "[t]he authorities outside of

this state are apparently unanimous in holding that, if the witnesses to the will are produced in court and are forgetful of all the facts, the law in such cases will supply the defect of proof by presuming that the requirements of the statute were duly observed, unless the contrary is proved and we cite a few of them". We observe that in the *Massey* case the issue was that one witness was dead at the time of probate and the other witness was unable to recall whether or not he signed the will nor whether the testator was present when the witness signed the document, his memory having completely lapsed. *Massey*, 248 S.W. at 1068. That question is not before us. The issue before us is whether or not the testator specifically requested that another sign the will for him at his direction. The only person so testifying was the wife, the interested party, and the court in a trial before it is the sole judge of the credibility of the witnesses and the weight to be given their testimony. We do not find authority in *Massey* for the proposition that where there is insufficient testimony to supply evidence that a specific request was made, that a defect of that proof will be cured by presuming that the requirements of the statute were observed. That does not to us appear to be good law under the facts of this particular case.

Appellant urges further as authority the case of *Trezevant v. Rains*, 19 S.W. 567 (Tex.1892) *rev'd on other grounds*, 85 Tex. 329, 23 S.W. 890 (1892), and the case of *Davenport v. Minshew*, 104 S.W.2d 951 (Tex.Civ.App.—San Antonio 1937, writ ref'd). We note that neither of these two cases is authority for the question presented here. In *Trezevant*, the testatrix was completely prostrate and attempted to sign but being too weak she specifically requested her daughter to assist her. *Trezevant*, 19 S.W. at 568. She was too weak to make a mark of any kind and her daughter executed the will in her behalf, in her presence, at her specific request. *Id.* The court ruled the signature sufficient. That case stands specifically for the proposition provided for in sec. 59 of the Probate Code

under consideration here, but the facts recited there are not the facts of our case. The testimony in the present case is that the testator could manipulate his hands for pipe smoking and to use his watch, although legally blind. The court impliedly found no believable testimony that he ever specifically requested any person to assist him, and there is testimony that he was never asked to make his own mark. In the *Davenport* case, the distinguishing characteristic was that although the testator could not sign his name because his hands shook severely, he could at least make his mark and did so beside his name which was signed by the drafting attorney. *Davenport*, 104 S.W.2d at 952. Again, those facts are not the facts of this instant case. Appellant has cited us to no other authority controlling the interpretation of sec. 59 of the Code and we have found none ourselves.

We conclude that there was sufficient evidence for the trial court to find that the will had not been executed properly in conformity to the requirements of law and that such a finding is not against the great weight and preponderance of the evidence. In this connection, we note this issue has been well settled and that an instrument which purports to be a will is not valid as a will where it is not signed with the testator's name by himself or by someone else by his direction, even though his name be recited in its body. *Armendariz De Acosta v. Cadena*, 165 S.W. 555 (Tex.Civ.App.—El Paso 1914, writ ref'd.). We hold that the statute in question requires that the signing of the will by another person for the testator must be done in pursuance of the previously expressed direction of the testator. Here, the trial court found insufficient evidence to conclude that the requirement of the statute had been met. We hold that the evidence was sufficient to support the trial court's implicit finding in this regard and that such a finding is not against the great weight and preponderance of the evidence. Accordingly, we overrule points of error one through eleven and affirm the judgment of the trial court.

Judgment affirmed.