

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-17-00097-CV

———————————————

ESTATE OF MICHAEL LYNN LUCE, DECEASED

On Appeal from County Court at Law No. 2
Parker County, Texas
Trial Court No. CIV-16-0132

Before Walker, Meier, and Kerr, JJ.
Memorandum Opinion by Justice Kerr
Dissenting Memorandum Opinion by Justice Meier (to follow)

## MEMORANDUM OPINION

This is the case of the blinking testator. In October 2015, Michael Lynn Luce was in a serious accident that left him a quadriplegic. A week after he was admitted to the hospital, Michael was intubated, which rendered him unable to speak. Paralyzed from the chest down and unable to speak, Michael was able to communicate by blinking his eyes to indicate "yes" and "no." Using this blinking system, Michael's attorney was able to draft a will based on Michael's blinked responses to a series of leading questions, and through this system, Michael directed a notary to sign the will for him.

After Michael died in November 2015, GayeLynne Luce, his estranged wife, filed an application to probate an earlier will of Michael's. Michael's sister, Tina Poole, filed an application to probate the 2015 will. After a jury trial, the trial court admitted the 2015 will to probate and appointed Tina as independent executor but awarded GayeLynne nearly $200,000 in attorney's fees and expenses. GayeLynne and Tina both appealed. As explained below, we reverse in part and affirm in part.

## I.
## Background

Michael and GayeLynne met in 1987. Both had children from previous marriages. Michael had seven-year-old twin daughters, Brandy and Melissa Luce. GayeLynne had three sons: nine-year-old Nathaniel Byrd and seven-year-old twins, Kevin and Jeremiah (Jeremy) Byrd. When Michael and GayeLynne married in 1989,

Kevin and Jeremy lived with them. Nathaniel lived with his father, and Brandy and Melissa lived with their mother about 20 minutes away.

Even though Brandy and Melissa lived nearby, they came to visit Michael and GayeLynne only every four to six weeks. And by the end of Michael and GayeLynne's first year of marriage, the girls rarely visited their father. In contrast to his distant relationship with his daughters, Michael shared a closer relationship with Kevin and Jeremy, with Michael's twice attempting to adopt them when they were children.

In 1998, Michael executed a will appointing GayeLynne as independent executor and bequeathing his entire estate to her if she survived him by 60 days, or if she did not, to a trustee for the benefit of his children named in the will: Nathaniel, Kevin, Jeremy, Brandy, and Melissa. In 2007, Michael legally adopted Kevin and Jeremy, who were then adults.[1] But according to GayeLynne, Michael's relationship with his daughters remained distant and strained until Michael's death.

Michael and GayeLynne's relationship was also not without conflict. According to GayeLynne, Michael had a bad temper and mental-health issues and was violent with her. During their 26-year marriage, they had separated four times, and

---

[1]At some point, Michael crossed out Nathaniel's name in the 1998 will, handwrote, "Nathaniel not to be included. Kevin & Jeremy Byrd adopted April 9, 2007 Henderson County, Texas," and signed his name. In March 2009, Michael crossed out the named trustee and alternate independent executor and made an amendment to the will. According to GayeLynne, the amendment only changed the alternate independent executor to Jeremy. But GayeLynne did not offer that amendment with the 1998 will for probate because she could not find it.

3

GayeLynne had filed for divorce twice. Each time, however, they were able to work things out. But in June 2015, GayeLynne and Michael separated again, and GayeLynne filed for divorce the following month.

The divorce was still ongoing when, on October 11, 2015, Michael was in an ATV accident that left him a quadriplegic. When he was admitted to the hospital immediately after the accident, medical records admitted into evidence at trial revealed that he was alert and oriented as to person, time, and place. Those records also reflected that the accident had not caused any head or brain injuries. Upon admission, Michael told hospital staff that he was going through a divorce and that if he became unable to make his own decisions, he wanted Brandy or Melissa to be his decisionmakers or, if they were not available, his sister. He made clear that even though he was still married to GayeLynne, he did not want her making any decisions for him.

On the morning of October 18, 2015, Michael—who was still hospitalized—went into respiratory failure and was intubated, leaving him unable to speak. Even so, he was still alert and oriented as to person, place, and time.

Later that day, attorney Kevin Ferrier came to the hospital's intensive-care unit to meet with Michael—who was still intubated and unable to speak—about making a will. Ferrier met with Michael alone and determined Michael's wishes through a series of leading questions that Michael answered by blinking his eyes to indicate "yes" or "no." Through this system, Ferrier was able to determine that Michael wanted to

4

revoke all prior wills and wanted to leave his entire estate to Melissa and Brandy. Ferrier then went back to his office, drafted the will in accordance with Michael's wishes, and returned to the hospital. He read the will to Michael privately and then read the will to Michael again in front of a notary and two witnesses. In the presence of Ferrier and the witnesses, the notary signed the will for Michael because he was physically unable to sign or make his mark. Then, while still in Michael's presence, the witnesses signed the will and the notary notarized their signatures. Throughout the entire execution process, only Michael, Ferrier, the two witnesses, and the notary were in the hospital room.

Michael died over a month later, on November 26, 2015. On December 8, 2015, GayeLynne filed an application to probate the 1998 will. A week later, Tina filed an application to probate the 2015 will[2] and an opposition to GayeLynne's probate application. In January 2016, GayeLynne filed an opposition to Tina's probate application.

The will contest was tried to a jury over four days in December 2016 in front of Judge Curtis Jenkins, the then-presiding judge of Parker County Court at Law Number Two.[3] GayeLynne and Tina testified, along with—by video deposition—

---

[2]The 2015 will appointed Tina as independent executor.

[3]GayeLynne and Tina both filed their probate applications in Parker County Court. *See* Tex. Est. Code Ann. §§ 31.001, 32.002(a) (West 2014); Tex. Gov't Code Ann. §§ 25.1861(a), .1863(a) (West Supp. 2018). On Tina's motion, the trial court properly transferred the will contest to Parker County Court at Law No. 2. *See* Tex.

5

Ferrier, Jason Pickering (one of the witnesses to the 2015 will), Bobbie Hobbs (the notary who had notarized the witnesses' signatures and had signed the 2015 will for Michael), and Dr. Barry Rath (a neuropsychologist who had examined Michael two days after the will's execution). The jury unanimously found that (1) both wills met the statutory execution requirements and were signed with testamentary intent; (2) Michael had the testamentary capacity to direct the signing of the 2015 will; (3) he did not direct the signing of the 2015 will because of undue influence; (4) the 2015 will revoked the 1998 will; (5) GayeLynne did not act in good faith and with just cause in prosecuting her suit for the purpose of defending and having the 1998 will admitted to probate; and (6) Tina acted in good faith and with just cause in prosecuting her suit for the purposes of defending and having the 2015 will admitted to probate and in contesting GayeLynne's probate application.

On December 22, 2016, Judge Jenkins signed a final judgment based on the jury's verdict and admitted the 2015 will to probate. On January 1, 2017, Judge Lynn Marie Johnson—who had defeated Judge Jenkins in the May 2016 primary election and later won the general election in November 2016—became the presiding judge of Parker County Court at Law Number Two.

---

Est. Code Ann. § 32.003(a) (West 2014); Tex. Gov't Code Ann. § 25.1863(b); Parker (Tex.) Dist. Ct. Loc. R. Assignment Docketing & Transfer of Cases, Civil Cases (requiring contested probate matters in Parker County to be filed in County Court at Law No. 2).

GayeLynne timely moved to vacate, modify, correct, or reform the judgment or, alternatively, for a new trial. In March 2017, Judge Johnson granted the motion with respect to the jury's good-faith-and-with-just-cause finding against GayeLynne and determined that GayeLynne was entitled to attorney's fees.[4] Judge Johnson denied the remainder of the motion.

In October 2017, Judge Johnson heard GayeLynne's and Tina's motions for attorney's fees and expenses. The trial court denied Tina's motion but awarded GayeLynne nearly $200,000 in attorney's fees and expenses.

GayeLynne and Tina each filed notices of appeal. After this case was submitted, the trial court removed Tina as independent executor and appointed John Dowdy as independent administrator of Michael's estate. On Dowdy's motion, we substituted him for Tina as the appellee / cross-appellant in this appeal. *See* Tex. R. App. P. 7.1(b).

## II.
## GayeLynne's Appeal

GayeLynne raises three issues: (1) the trial court erred by admitting the 2015 will to probate; (2) the trial court abused its discretion by not allowing Jeremy to

---

[4] *See* Tex. Est. Code Ann. § 352.052(a) (West Supp. 2018) ("A person designated as executor in a will or an alleged will, or as administrator with the will or alleged will annexed, who, for the purpose of having the will or alleged will admitted to probate, defends the will or alleged will or prosecutes any proceeding in good faith and with just cause, whether or not successful, shall be allowed out of the estate the executor's or administrator's necessary expenses and disbursements in those proceedings, including reasonable attorney's fees.").

7

testify and by excluding parts of Ferrier's, GayeLynne's, Hobbs's and Tina's testimonies and associated documentary evidence; and (3) the evidence is legally and factually insufficient to support the jury's finding that the 2015 will was not the result of undue influence. We address each of these issues in turn.

**A. The trial court correctly admitted the 2015 will to probate.**

In her first issue, GayeLynne asserts that the trial court erred by admitting the 2015 will to probate because it is not a valid will. Because the 2015 will had not been admitted to probate, Tina—as the proponent of that will—bore the burden at trial to prove that it was properly executed and that Michael had testamentary capacity at the time of execution. *See Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex. 1983); *Douthit v. McLeroy*, 539 S.W.2d 351, 352 (Tex. 1976). Tina made out a prima facie case on these issues by introducing the 2015 will—which is self-proving—into evidence.[5] *See Estate of Danford*, 550 S.W.3d 275, 281 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *see also In re Estate of Arrington*, 365 S.W.3d 463, 467 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *James v. Haupt*, 573 S.W.3d 285, 288 (Tex. Civ. App.—Tyler 1978, writ ref'd n.r.e.). The burden of producing evidence then shifted to GayeLynne as the will's opponent to overcome the prima facie case, but the burden of persuasion

---

[5]The 2015 will meets the requirements for a self-proving will. *See* Tex. Est. Code Ann. § 251.101(2) (West 2014), § 251.1045 (West Supp. 2018). A self-proved will cannot otherwise be treated differently from a will that is not self-proved and may be contested in the same manner as a will that is not self-proved. Tex. Est. Code Ann. §§ 251.102(b), .106 (West 2014).

remained with Tina. *See Danford*, 550 S.W.3d at 28; *James*, 573 S.W.2d at 288. On appeal, GayeLynne argues that Tina failed to carry her burden because there is no evidence, or alternatively insufficient evidence, to support the jury's findings that the 2015 will was duly executed according to the statutory signature requirement and that Michael had testamentary capacity to execute the 2015 will.

1. *Standards of review*

We may sustain a legal-sufficiency challenge only when (1) the record is wholly devoid of evidence of a vital fact, (2) legal or evidentiary rules bar us from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the record evidence pertinent to that finding, we determine that the credible evidence

9

supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). When conducting a factual-sufficiency review, a court of appeals must not merely substitute its judgment for that of the trier of fact. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The trier of fact—the jury in this case—is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *See id.*

When, as here, there was no objection to the jury charge, we review the legal and factual sufficiency of the evidence in light of the charge submitted. *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 (Tex. 2005) (citing *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001)); *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002).

*2. The statutory signature requirement*

Estates code section 251.051(2) requires that a will be signed by the testator or, as relevant here, by another person on the testator's behalf in the testator's presence and under the testator's direction. Tex. Est. Code Ann. § 251.051(2) (West Supp. 2018); *see, e.g., Trezevant v. Rains*, 19 S.W. 567, 568 (Tex.), *rev'd on other grounds*, 23 S.W. 890 (Tex. 1892) (concluding that signature requirement was satisfied where testatrix—who was completely prostrate and too weak to sign her will—specifically asked her daughter to guide her hand and wrist in signing the will). Here, in finding that the

10

2015 will was signed with testamentary intent and executed in accordance with the statutory signature requirements, the jury implicitly found that Hobbs signed the will on Michael's behalf in his presence and under his direction. GayeLynne argues that the evidence is legally and factually insufficient to support the jury's finding that Michael directed Hobbs to sign the 2015 will.

It is undisputed that Michael was unable to speak at the time the 2015 will was executed and that because of his quadriplegia, he could not sign his name or make his mark. Ferrier testified that when he arrived at the hospital, a nurse told him that Michael was able to communicate by blinking, so Ferrier and Michael established a "signal system" in which Michael would blink once to answer "yes" and twice to answer "no," or vice versa. Even though Ferrier could not remember at trial which system he and Michael had established, Ferrier testified that he was able to communicate with Michael based on Michael's blinked responses to a series of leading questions. Through these questions and Michael's blinked responses, Ferrier established an attorney-client relationship with Michael and determined that Michael wanted to make a new will that revoked any earlier ones.

Ferrier also testified that because Michael's medical condition rendered him physically unable to sign or make his mark, Ferrier had researched Texas Government Code section 406.0165, which provides that

> A notary may sign the name of an individual who is physically unable to sign or make a mark on a document presented for notarization if directed to do so by that individual, in the presence of a witness who has

11

no legal or equitable interest in any real or personal property that is the subject of, or is affected by, the document being signed.

Tex. Gov't Code Ann. § 406.0165(a) (West 2013). Based on section 406.0165, Ferrier determined that a notary could sign the will for Michael, and when Ferrier drafted the will, he included the following under Michael's signature line: "Signature affixed by notary in the presence of _____ (insert name of disinterested witness), a disinterested witness, under section 406.0165 of the Texas Government Code." *See id.* § 406.0165(b) (requiring notary who signs a document under section 406.0165 to write the same or substantially similar sentence under her signature).

When Ferrier returned to the hospital with the drafted will, he met with Michael privately to explain the execution process and that the law allowed a notary to sign the will for him. Through the blinking system, Michael confirmed to Ferrier that he understood the execution process, that Hobbs was signing the will for him, and that he was requesting Hobbs to sign for him. According to Ferrier, Michael directed Hobbs to sign the will on his behalf in Ferrier's presence.

Pickering, one of the 2015 will's witnesses, also testified about its execution.[6] Ferrier explained the blinking system to Pickering, the other witness (Cara Brown), and Hobbs. But like Ferrier, Pickering could not remember whether one blink meant "yes" and two blinks meant "no" or vice versa. Even so, Pickering testified that

---

[6]Pickering did not know Michael but happened to be at the hospital that day visiting a friend who was also in the ICU.

Michael made it very clear though the blinking system that he wanted the notary to sign the will for him.

Hobbs, the notary, similarly testified that Ferrier explained the blinking system to her and to the two witnesses, but she too could not remember whether one blink meant "yes" and two blinks meant "no" or vice versa.[7] Hobbs asked Michael if he wanted her to sign the will for him, and he answered "yes" using the blinking system. Hobbs testified that Michael understood that she was signing the will for him, and there was no question in Hobbs's mind that Michael wanted her to sign the will for him. Hobbs further testified that she signed the will at Michael's direction. After Hobbs signed the will for Michael, Brown signed her name in the blank provided to indicate that she was the disinterested witness government code section 406.0165 requires.[8] *See id.*

GayeLynne argues that this evidence is legally and factually insufficient to support the jury's finding that Michael directed Hobbs to sign the 2015 will for him because, at best, Michael merely consented to her signing for him. To support her argument, GayeLynne relies heavily on *Muhlbauer v. Muhlbauer*, 686 S.W.2d 366 (Tex. App.—Fort Worth 1985, no writ). In that case, the testator signed a will while his wife (who was the primary beneficiary) guided his hand. *Id.* at 368, 373. The attorney who

---

[7]Hobbs, a mobile notary, did not know Michael.

[8]Like Pickering, Brown was at the hospital that day visiting someone and did not know Michael.

had drafted the will testified that he did not remember whether he or the testator asked the wife to guide the testator's hand, but there was "[n]o question" that the testator consented to his wife guiding his hand. *Id.* at 370–72. The attorney also testified that the testator was never given the opportunity to make his mark or an "X." *Id.* at 372. According to the wife, the testator was physically unable to make his mark, and she guided his hand because he did not have the strength to guide it himself. *Id.* at 373–75. But she also testified that the testator was able to use his hands and arms well enough to smoke a pipe and to raise his wristwatch up to his eyes (the testator was legally blind). *Id.* at 373–74, 377. Based on this evidence, the trial court refused to admit the will to probate after orally finding that the will was not signed at the husband's direction. *Id.* at 376.

On appeal, the wife argued that the trial court's refusal to admit the will to probate was against the great weight and preponderance of the evidence. *Id.* at 368–69. This court determined that "[i]t is clear that the language [of section 251.051(2)'s predecessor] is directory in nature and provides only that the will be signed by the testator in person or alternatively only by another for him by his direction and in his presence." *Id.* at 376. We went on to hold that the statute requires that "the signing of the will by another person for the testator must be done in pursuance of the previously expressed direction of the testator." *Id.* at 377. After reviewing the evidence, we affirmed, determining that the trial court's refusal to admit the will to probate—a refusal based on an implied finding that the will was not signed at the

14

husband's direction—was not against the great weight and preponderance of the evidence. *See id.*

*Muhlbauer* is distinguishable. Here, we are not asked to determine whether the evidence was factually sufficient to support the factfinder's finding that the will *was not signed* at the testator's direction but rather whether the evidence is sufficient to support the jury's finding that the will *was signed* at Michael's direction. Also, unlike *Muhlbauer*, it is undisputed that Michael could not speak and could not physically sign his name or make his mark. Ferrier, Pickering, and Hobbs each testified that using the blink system, Michael directed Hobbs to sign the 2015 will for him. Viewing the evidence under the applicable standards of review stated above, we hold that there is some evidence to support the jury's finding that Michael directed another person to sign the will for him and that this finding is not against the great weight and preponderance of the evidence. We therefore overrule this part of GayeLynne's first issue.

*3. Michael's testamentary capacity*

The jury also found that Michael had testamentary capacity to sign the 2015 will. GayeLynne argues that the evidence is legally and factually insufficient to support this finding given the severity of Michael's medical condition, his isolation from his immediate family, and his inability to communicate other than by blinking "yes" or "no" in response to Ferrier's leading questions, which were based solely on information that Tina provided. GayeLynne also complains that Michael never expressed any desire to draft a new will, that the new will was solely at Tina's

15

direction, and that the 2015 will—without any explanation—leaves Michael's entire estate to his estranged daughters and excludes GayeLynne and his sons. Specifically, GayeLynne contends that the evidence is insufficient to prove that Michael understood the contents of the 2015 will and that he knew the "natural objects of his bounty and their claim on him" because the will excludes his sons.

Michael's medical records that were introduced at trial reveal that Michael did not suffer a head or brain injury because of the accident. When he was admitted to the hospital immediately after the accident, he was alert and oriented as to person, time, and place. Regarding GayeLynne, Michael's hospital admission notes read as follows:

> States that he is going through a divorce right now and would like [h]is two daughters Melissa or Brandy to be his decision makers in the event he isn[']t able to make decisions for himself. States that if they are not available his sister could also make decisions. Makes it clear he does not want his wife making any decisions for him even though the divorce is not final yet.

A week later, on the morning of October 18, Michael went into respiratory failure and was intubated. That afternoon, Tina's husband called Ferrier—an estate-planning and probate attorney for whom Tina's daughter-in-law had previously worked as a legal assistant—to tell him that Michael wanted to see an attorney about estate planning. Ferrier testified that he had already anticipated doing some estate planning for Michael because Tina had contacted Ferrier about the accident the week before.

Ferrier further testified that he was familiar with testamentary-capacity issues and that if he ever questioned a client's capacity to make a will, he would refer the client to a physician for a capacity determination. Ferrier further testified that in the past, he had refused to draft a will or codicil for a client because the client lacked capacity.

When Ferrier arrived at the hospital mid-afternoon on October 18, Tina took him to the ICU so that the nurses knew why he was there; Tina then left. According to Ferrier, even though Michael was paralyzed and intubated, he was awake, alert, and lucid. Michael's nurse explained his injuries to Ferrier and informed him that Michael's pain medications had been suspended for twelve to fifteen hours. The nurse also told Ferrier that Michael could communicate by blinking his eyes.

Ferrier met with Michael alone and determined that they could communicate using the blinking system. By asking Michael a series of leading questions, Ferrier was able to determine Michael's wishes based on Michael's blinked responses. Michael communicated to Ferrier that he wanted to make a new will disposing of his assets and property, who he wanted to inherit under the new will, and that he intended to revoke any prior wills.

Ferrier further testified that Michael understood the nature and extent of his assets and knew who his family members were. Ferrier knew that Michael and GayeLynne were in the process of divorcing, and Michael made clear to Ferrier that he did not want his wife to take under the new will. Ferrier had learned the identities

of Michael's children from the members of Michael's family who were at the hospital that day (Tina and her husband; Michael's sister Patricia and her husband; Brandy and her husband; and Melissa and her husband). Tina had discussed Kevin and Jeremy with Ferrier, but it was unclear to Ferrier whether Michael had formally adopted them. Ferrier and Michael discussed Kevin and Jeremy, but Michael "made it perfectly clear he wanted his two daughters to be the sole beneficiaries."

During his meeting with Michael, Ferrier would periodically confirm that Michael understood what was going on and that the will's provisions were what he wanted. Throughout the process, Ferrier felt that he and Michael were "on the same page" and were able to communicate even though they communicated solely through the blinking system. According to Ferrier, Michael was of sound mind, and Ferrier had no concerns about Michael's capacity.

After meeting with Michael, Ferrier left the hospital and went to his office to prepare the will according to Michael's instructions. In a section titled "Identity of the Family," the will states that GayeLynne is Michael's spouse but that he is "specifically not making any provisions for her in this Will because [they] are in the process of divorcing." In the same section, the will states: "At the time of execution of this Will, I have two daughters, namely, Melissa Ann Long and Brandy Jo Luce." The will makes no mention of Kevin and Jeremy.

When Ferrier returned to the hospital with the will that evening, Michael was as lucid and clear-headed as he was earlier. Ferrier met with Michael alone and read the

will to him. Using the blinking system, Michael confirmed to Ferrier that the will Ferrier had prepared was what Michael wanted. At the time he read the will to Michael, Ferrier believed that Michael had sufficient mental ability to understand what they were discussing, to understand the effect of the act of signing a will, to understand the nature and extent of his property, to know his next of kin and the natural objects of his bounty, to collect the elements of the business to be transacted, and to hold those elements in his mind long enough to perceive their relationship to each other and to make a reasonable judgment as to those elements.

Ferrier read the will to Michael again in the presence of the two witnesses and the notary. As Ferrier went through the will, he periodically asked Michael questions to again confirm that Michael understood and agreed with the will's provisions. Pickering testified that Michael "clearly" and "absolutely" understood what was going on. And to clear up any doubts in his mind, Pickering independently asked Michael if he understood that he was making a will and if the will was what he wanted. Through the blinking system, Michael answered "yes" to both inquires. Both Pickering and Hobbs testified that Michael understood what was going on, that he understood that the document Ferrier had prepared and read was a will, that he understood the will's provisions and their effects, and that the will was what Michael wanted.

Two days after the will's execution, Dr. Rath examined Michael. Michael was still unable to speak because he was intubated, but he was able to communicate with Dr. Rath by either slightly nodding his head "yes" and "no" or by casting his gaze at

index cards labeled "yes" and "no."[9] As a result of the examination, Dr. Rath determined that Michael was fully competent and able to make his own decisions, including financial and medical decisions.[10] Dr. Rath opined that when Michael executed the 2015 will two days before the examination, Michael had sufficient mental ability to make a will.

A person must be of sound mind to execute a valid will. *See* Tex. Est. Code Ann. § 251.001 (West Supp. 2018). "Sound mind" means having testamentary capacity. *Bracewell v. Bracewell*, 20 S.W.3d 14, 19 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Testamentary capacity requires that the testator, at the time the will is executed, have sufficient mental ability to understand he is making a will, the effect of making the will, and the general nature and extent of his property. *Horton v. Horton*, 965 S.W.2d 78, 85 (Tex. App.—Fort Worth 1998, no pet.); *Tieken v. Midwestern State Univ.*, 912 S.W.2d 878, 882 (Tex. App.—Fort Worth 1995, no writ). He must also know his next of kin and the natural objects of his bounty, the claims upon them, and have sufficient memory to collect in his mind the elements of the business transacted and hold them long enough to perceive their obvious relation to each other and form

[9]Pickering also testified that Michael was able to nod his head "just very little," and that when he asked Michael if the will was what he wanted, Michael blinked "yes" and "nudged his head a little bit." But Ferrier testified that Michael could not nod. Regardless, Ferrier, Pickering, Hobbs, and Dr. Rath were uniform in their testimony that they were able to communicate with Michael.

[10]Dr. Rath's examination notes, which were admitted into evidence, also reflect his opinion that Michael was "fully competent and able to make his own decisions."

a reasonable judgment about them. *Horton*, 965 S.W.2d at 85; *Tieken*, 912 S.W.2d at 882. The jury here was instructed on all these elements.

Even though Michael was seriously injured in the ATV accident, he did not suffer any head or brain injury. Ferrier, Pickering, Hobbs, and Dr. Rath each testified that even though Michael was unable to speak because he was intubated, he was alert and lucid and had the mental capacity to understand what was going on and to make his own decisions at the time the 2015 will was executed. *See Horton*, 965 S.W.2d at 86 ("Evidence of physical infirmities, without more, does not tend to prove that a testator is incapable of knowing his family or his property, or understanding the effect of signing the will."). Ferrier testified extensively regarding the steps he took using the blinking system to ensure that Michael wanted to execute the 2015 will, that the will disposed of Michael's property in accordance with his wishes, and that he understood the will's provisions. Ferrier, Pickering, and Hobbs testified that through the blinking system, Michael communicated that the 2015 will was what he wanted.

GayeLynne suggests that because the will omits any mention of Kevin and Jeremy, it incorrectly identifies Michael's family, thus indicating that Michael did not know his next of kin and the natural objects of his bounty. But Ferrier specifically questioned Michael about his sons, and Michael was clear that he wanted only his daughters to inherit. Even though there was evidence that Michael was estranged from his two daughters for most of their lives and enjoyed a closer relationship with his sons, Michael was in the process of divorcing GayeLynne (his adopted sons'

21

biological mother) and made it clear to hospital staff a week before the 2015 will was executed that he did not want her involved in making decisions for him and wanted his daughters to make those decisions. A testator is not obligated to bequeath anything to his spouse or to any or all his children, adopted or biological. *See Estate of Good*, 274 S.W.2d 900, 902 (Tex. Civ. App.—El Paso 1955, writ ref'd n.r.e.) ("It is the common idea . . . that children have the right to some of the property of parents, but it is the law of Texas that a citizen of this state may by his will dispose of his property without regard to the ties of nature and relationship, and may do so in defiance of the rules of justice or the dictates of reason . . . .").

Accordingly, viewing the evidence under the applicable standards of review stated above, we hold that some evidence supports the jury's finding that Michael had testamentary capacity to sign the 2015 will and that this finding is not against the great weight and preponderance of the evidence. We therefore overrule the remainder of GayeLynne's first issue.

## B. The trial court did not abuse its discretion by excluding GayeLynne's evidence or error, if any, did not cause the rendition of an improper judgment.

In her second issue, GayeLynne contends that the trial court erred by excluding Jeremy's testimony entirely and by excluding parts of Ferrier's, GayeLynne's, Hobbs's, and Tina's testimonies and associated documentary evidence. She asserts that the excluded evidence was relevant to Michael's testamentary capacity to execute the 2015 will and to her claim that the 2015 will was the product of Tina's undue

influence. She argues that the trial court's exclusion of this evidence was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment.[11] *See* Tex. R. App. P. 44.1(a)(1).

*1. Standard of review*

We review the trial court's admission or exclusion of evidence for an abuse of discretion. *State v. Bristol Hotel Asset Co.*, 65 S.W.3d 638, 647 (Tex. 2001). A trial court abuses its discretion if the court acts without reference to any guiding rules or principles—that is, if the act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

---

[11]GayeLynne timely filed a formal bill of exception containing largely the same evidence she presented in her offers of proof at trial and the same exhibits the trial court admitted at trial "for record purposes only." *See* Tex. R. App. P. 33.2(e)(1). Tina objected to the bill. When, as here, the parties do not agree on a bill's contents, the trial judge, after notice and hearing, must (1) find the bill is correct, sign it, and file it with the trial-court clerk; (2) suggest corrections to the complaining party, and if the complaining party agrees to the corrections, sign and file the bill with the trial-court clerk; or (3) if after making suggested corrections, the complaining party will not agree to the corrections, return the bill to the complaining party with the judge's written refusal on it. Tex. R. App. P. 33.2(c). Here, the trial judge did not hear the bill, sign the bill, or suggest corrections. Thus, any errors complained of in GayeLynne's bill of exception that were not presented in her offers of proof and exhibits admitted for record purposes only are not preserved for our review. *See Bryan v. Watumull*, 230 S.W.3d 503, 516–17 (Tex. App.—Dallas 2007, pet. denied).

*2. Jeremy's testimony*

GayeLynne did not disclose Jeremy as a person with knowledge of relevant facts. *See* Tex. R. Civ. P. 194.2(e). Nor did she list him on her fact-witness list, which she filed a day after the December 5 scheduling-order deadline. But during her case-in-chief, GayeLynne attempted to call Jeremy as a witness. After Tina rested, GayeLynne tried to call Jeremy again, this time as a rebuttal witness.[12] Each time, Tina objected because GayeLynne had not disclosed Jeremy as a person with knowledge of relevant facts. *See id.* The trial court sustained Tina's objections and did not allow Jeremy to testify.[13]

In response to a disclosure request about persons with knowledge of relevant facts, a party must provide the name, address, and telephone number of such persons along with a brief statement of each identified person's connection with the case. Tex. R. Civ. P. 192.3(c), 194.2(e), 194.3. A party cannot call to testify a nonparty witness whom she should have identified during discovery unless she can establish either good cause for failing to identify the witness or that the failure would not unfairly surprise or unfairly prejudice the opposing party. *See* Tex. R. Civ. P. 193.6(a); *Beam v.*

[12]During rebuttal, GayeLynne intended to have Jeremy rebut Tina's testimony and authenticate a text message exchange with Tina that she denied having with him.

[13]According to GayeLynne's offer of proof, Jeremy was going to testify regarding his close relationship with Michael, which began when Jeremy was seven years old; Michael's attempts to adopt Jeremy as a child; Michael's nonexistent relationship with his daughters; Michael's involvement with Jeremy's children; Tina's failure to inform Jeremy of Michael's accident; and Tina's alleged removal of $400,000 from Michael's bank account shortly before he died.

*A.H. Chaney, Inc.*, 56 S.W.3d 920, 922 (Tex. App.—Fort Worth 2001, pet. denied); *see also Fort Brown Villas III Condo. Ass'n v. Gillenwater*, 285 S.W.3d 879, 881 (Tex. 2009) (recognizing that rule 193.6's exclusionary sanction is automatic unless one of the rule's exceptions applies). The party seeking to admit the testimony bears the burden to establish good cause or lack of unfair surprise or unfair prejudice. *See* Tex. R. Civ. P. 193.6(b). It is within the trial court's discretion to determine whether that party has met this burden. *Bellino v. Comm'n for Lawyer Discipline*, 124 S.W.3d 380, 383 (Tex. App.—Dallas 2003, pet. denied).

GayeLynne does not dispute that she failed to disclose Jeremy as a person with knowledge of relevant facts in response to Tina's disclosure requests. Nor does she dispute that she failed to list Jeremy on her witness list. Instead, she contends, her failure did not unfairly surprise or unfairly prejudice Tina because Tina listed Jeremy on her own witness list, and GayeLynne's witness list incorporated Tina's.[14] *See* Tex. R. Civ. P. 193.6(a)(2).

Tina was aware of Jeremy's relationship to the case: he was a contingent beneficiary under the 1998 will, and Tina's witness list identified Jeremy as GayeLynne's son and Michael's adopted son.[15] But the record does not indicate that Tina knew what Jeremy would testify to if GayeLynne called him to testify, because

---

[14]On appeal, GayeLynne does not argue that there was good cause for her failure to disclose Jeremy. *See* Tex. R. Civ. P. 193.6(a)(1).

[15]On her witness list, Tina listed Jeremy's contact information as "unknown."

she did not disclose Jeremy and he had not been deposed. GayeLynne's filing a witness list incorporating Tina's witness list—which named more than 50 witnesses— less than a week before trial was insufficient notice of GayeLynne's intent to call Jeremy as a witness. Based on this record, the trial court did not abuse its discretion by concluding that GayeLynne did not establish lack of unfair surprise or unfair prejudice and therefore by excluding Jeremy's testimony.[16] *See* Tex. R. Civ. P. 193.6(a)–(b).

### 3. GayeLynne's testimony and associated documentary evidence

The trial court sustained Tina's relevancy objections and excluded (1) GayeLynne's testimony comparing Michael's nonexistent relationship with his daughters and their children to his close relationship with Jeremy, Kevin, and their children; (2) GayeLynne's testimony about Michael's efforts to adopt Jeremy and Kevin while they were children; (3) Michael's obituary listing Melissa, Brandy, Jeremy, and Kevin as his children; (4) a 2011 obituary for Brandy's stillborn child that did not list Michael as one of the child's grandparents; and (5) the 2007 court order granting

---

[16]On appeal, GayeLynne does not assert that she was not required to disclose Jeremy because he was a rebuttal witness, much less explain how Jeremy's testimony could not have been reasonably anticipated before trial. *See* Tex. R. Civ. P. 192.3(d) (stating that a party is not required to disclose the identity of "rebuttal or impeaching witnesses the necessity of whose testimony cannot reasonably be anticipated before trial"); *Jurek v. Herauf*, No. 14-07-00727-CV, 2009 WL 179204, at *3 (Tex. App.—Houston [14th Dist.] Jan. 27, 2009, no pet.) (mem. op.) ("A rebuttal witness still has to be disclosed if the need to call that witness reasonably should have been anticipated."). Because GayeLynne does not raise these arguments, we do not address them. *See* Tex. R. App. P. 38.1(f), (i).

26

Michael's application to adopt Kevin and Jeremy. GayeLynne argues that the trial court erred by excluding this evidence because it was relevant to Michael's testamentary capacity and to her undue-influence claim.

As noted, testamentary capacity requires that a testator have sufficient mental ability to make a will. *See Horton*, 965 S.W.2d at 85; *Tieken*, 912 S.W.2d at 882. In a will contest, "the proper inquiry is whether the testator had testamentary capacity on the day the will was executed." *Horton*, 965 S.W.2d at 85 (citing *Lee v. Lee*, 424 S.W.2d 609, 611 (Tex. 1968)). But the testator's state of mind at other times can be used to prove his state of mind on the day he executed the will if the evidence shows that a condition affecting his testamentary capacity was persistent and likely was present at the time the will was executed. *Long v. Long*, 196 S.W.3d 460, 465 (Tex. App.—Dallas 2006, no pet.); *see Croucher*, 660 S.W.2d at 57 ("Evidence of incompetency at other times can be used to establish incompetency on the day the will was executed if it 'demonstrates that the condition persists and has some probability of being the same condition which obtained at the time of the will's making.'" (quoting *Lee*, 424 S.W.2d at 611)). To successfully challenge a testator's mental capacity with circumstantial evidence from time periods other than the day on which the will was executed, the will contestant must establish that (1) the evidence offered indicates a lack of testamentary capacity; (2) the evidence is probative of the testator's capacity (or lack thereof) on the day the will was executed; and (3) the evidence provided is of a satisfactory and convincing character, because probate will not be set aside on the

basis of evidence that creates only a suspicion of mental incapacity. *See Horton*, 965 S.W.2d at 85.

GayeLynne argues that the evidence regarding Michael's relationship with his children is relevant to whether Michael "knew the 'nature of his bounty and their claims upon them'" because the 2015 will disinherited Kevin and Jeremy, with whom he had a close and loving relationship, and designated Melissa and Brandy—from whom he was estranged—as primary beneficiaries. Relevant evidence tends to make a fact of consequence to the action more or less probable than it would be without the evidence and is generally admissible. Tex. R. Evid. 401, 402. GayeLynne's excluded testimony was not probative of Michael's *mental ability* to know his next of kin and natural objects of his bounty on the day of the 2015 will, nor does it indicate a lack of testamentary capacity at any time, much less Michael's capacity on the day the 2015 will was signed. Accordingly, with respect to Michael's testamentary capacity, the trial court did not err by excluding GayeLynne's evidence regarding Michael's relationship with his children.

But GayeLynne's testimony and documentary evidence might have been relevant to her undue-influence claim. "[U]ndue influence implies the existence of a testamentary capacity subjected to and controlled by a dominant influence or power." *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963). To establish undue influence, the contestant (here, GayeLynne) must prove the existence and exertion of an influence that subverted or overpowered the testator's mind at the time he executed

the will such that the testator executed a will that he otherwise would not have executed but for such influence. *See id.*; *Long*, 196 S.W.3d at 467.

The final element focuses on whether the will's disposition of property is unnatural. *Rothermel*, 369 S.W.2d at 923. A disposition may be unnatural, for example, if it excludes a testator's natural heirs or favors one heir at the expense of others who ordinarily would receive equal treatment. *See Long v. Long*, 125 S.W.2d 1034, 1036 (1939). The disinheritance of close relatives or loved ones is not necessarily an unnatural disposition. *See, e.g.*, *Guthrie v. Suiter*, 934 S.W.2d 820, 832 (Tex. App.—Houston [1st Dist.] 1996, no writ) (concluding that exclusion of testator's only living son from will not unnatural given strained and distant relationship between him and his mother). "But a testator's preference for one heir over others of an equal or similar degree of kinship may be unnatural if the record does not disclose a reasonable basis for the preference or contains proof that calls the preference into question or discredits it." *Yost v. Fails*, 534 S.W.3d 517, 525 (Tex. App.—Houston [1st Dist.] 2017, no pet.), *rev'd on other grounds*, *Archer v. Anderson*, 556 S.W.3d 228, 239 & n.78 (Tex. 2018) (citing *Rothermel*, 369 S.W.2d at 923–24; *Curry v. Curry*, 270 S.W.2d 208, 213 (Tex. 1954); *Craycroft v. Crawford*, 285 S.W. 275, 278–79 (Tex. Comm'n App. 1926, holding approved, judgm't adopted)).

Here, even if GayeLynne's evidence regarding Michael's relationship with his children was relevant to the last prong of her undue-influence claim, we cannot say its exclusion probably caused rendition of an improper judgment. Whether a particular

29

disposition is unnatural is usually for the factfinder to decide based on the circumstances. *Yost*, 534 S.W.3d at 525. Here, as we explain more fully in part II(C) below, the jury heard evidence that at the time of the accident, GayeLynne and Michael were in the middle of divorce and that when Michael was admitted to the hospital, he was adamant that he did not want GayeLynne making medical decisions for him but wanted his daughters or sister to do so. And when Michael met with Ferrier a week later to draft the will, Michael made clear to Ferrier that he did not want GayeLynne, Kevin, and Jeremy to inherit. Accordingly, even if the trial court erred by excluding GayeLynne's evidence regarding Michael's relationship with his children, we hold that it probably did not cause the rendition of an improper judgment on GayeLynne's undue-influence claim.

### 4. *Ferrier's testimony and associated documentary evidence*

GayeLynne next complains that the trial court abused its discretion by excluding parts of Ferrier's testimony and the exhibits used at his deposition. As noted, Ferrier testified through video deposition at trial. At the close of Tina's direct examination of Ferrier, Tina objected to GayeLynne's playing the cross-examination for the jury because GayeLynne had not notified Tina that she intended to use any video depositions at trial. Following much discussion, the trial court allowed GayeLynne to play her cross-examination of Ferrier and agreed to allow Tina to object to GayeLynne's cross-examination questions.

After the trial court sustained Tina's first objection, it instructed the jury, "Jurors, there will be an objection, there will be an answer. Put it out of your mind. You're instructed not to consider any evidence that comes in to which I've sustained an objection." GayeLynne asserts that this instruction resulted in the exclusion of the following evidence:

- Ferrier knew that Michael had two daughters;

- Ferrier had a discussion with Tina about whether Michael had legally adopted Kevin and Jeremy;

- at the time Ferrier drafted the will, it was unclear to him whether Michael had legally adopted the boys;

- Ferrier could not recall if Tina had told him whether Michael had adopted the boys; and

- when drafting the will, Ferrier did not take the time to determine whether Michael had legally adopted the boys.

But the record shows that GayeLynne's complaints on appeal have no basis: the trial court did not actually sustain objections to the questions that elicited the above responses from Ferrier. In other words, the trial court did not exclude this evidence.

GayeLynne also asserts that the trial court erred by not allowing her to present exhibits at trial that corresponded with exhibits that were used to cross-examine Ferrier during his deposition. Once again, our review of the record shows that this complaint has no basis because the trial court did not refuse to admit at trial the exhibits used during Ferrier's deposition.

31

*5. Hobbs's testimony and associated documentary evidence*

GayeLynne contends that the trial court erred by not allowing her to play Hobbs's entire cross-examination to the jury and by excluding Hobbs's previously executed affidavit, which GayeLynne had used during the deposition to impeach Hobbs. GayeLynne asserts that the trial court abused its discretion by excluding this evidence under rule 193.6(a).

Yet again, our review of the record shows that GayeLynne's appellate complaints are unsupported. First, as with Ferrier's cross-examination, the trial court did allow GayeLynne to play Hobbs's entire deposition testimony for the jury. Although the trial court did sustain some of Tina's objections during Hobbs's cross-examination and sustained her objection to Hobbs's affidavit, none of Tina's objections to Hobbs's testimony or to her affidavit was based on the rule 193.6(a). Accordingly, GayeLynne has waived this issue. *Cf. Cantu v. Horany*, 195 S.W.3d 867, 871 (Tex. App.—Dallas 2006, no pet.) ("[W]hen an appellee urges several objections to a particular piece of evidence and, on appeal, the appellant complains of its exclusion on only one of those bases, the appellant has waived that issue for appeal because he has not challenged all possible grounds for the trial court's ruling that sustained the objection.").

*6. Bank records*

Finally, GayeLynne complains that the trial court abused its discretion by not admitting into evidence bank records allegedly showing that Tina transferred almost

$400,000 from Michael's bank account to her own shortly before he died. GayeLynne intended to use these records to impeach Tina, who denied transferring the money. But Tina objected to the bank records because GayeLynne did not timely produce them, and the trial court sustained Tina's objection. *See* Tex. R. Civ. P. 193.6(a).

Amended or supplemental discovery responses made less than 30 days before trial are presumed untimely. *See* Tex. R. Civ. P. 193.5(b). A party who fails to make, amend, or supplement a discovery response in a timely manner cannot introduce into evidence documents that were not timely disclosed unless the proponent of that evidence proves good cause for the failure or the failure will not unfairly surprise or unfairly prejudice the other party. *See* Tex. R. Civ. P. 193.6(a)–(b). "To escape rule 193.6's automatic exclusion provision, the burden is on the party seeking to admit the evidence to establish good cause or the lack of unfair surprise or unfair prejudice." *White v. Perez*, No. 2-09-251-CV, 2010 WL 87469, at *1 (Tex. App.—Fort Worth Jan. 7, 2010, pet. denied) (mem. op.).

Tina's production requests to GayeLynne included a request for bank records. GayeLynne produced some bank records to Tina but admitted that she did not supplement her production responses with the bank records at issue until less than two weeks before trial, which was presumptively untimely. *See* Tex. R. Civ. P. 195.3(b). A party may not impeach a witness with documents not timely produced in response to a specific discovery request for those documents unless she satisfies one of rule 193.6(a)'s exceptions. *See Lopez v. La Madeleine of Tex., Inc.*, 200 S.W.3d 854,

33

856–57, 859–63 (Tex. App.—Dallas 2006, no pet.). GayeLynne made no attempt to show in the trial court—nor does she argue on appeal—that she had good cause for failing to timely supplement her discovery responses or that her failure would not unfairly surprise or unfairly prejudice Tina. Accordingly, we conclude that the trial court did not abuse its discretion by excluding the bank records. *See* Tex. R. Civ. P. 193.6(a)–(b).

Having concluded that the trial court either did not abuse its discretion by excluding GayeLynne's evidence, or alternatively, that the exclusion did not harm GayeLynne, we overrule her second issue.

## C. The evidence is sufficient to support the jury's no-undue-influence finding.

In her final issue, GayeLynne argues that even if the trial court's evidentiary rulings were correct, the evidence presented at trial is legally and factually insufficient to support the jury's finding that the 2015 will was not the result of undue influence. The jury was instructed that "undue influence" means that (1) "an influence existed and was exerted"; (2) "the influence undermined or overpowered the mind of the decedent at the time he signed the document"; and (3) "the decedent would not have directed the signing of the document but for the influence." *See Rothermel*, 369 S.W.2d at 922. As the party contesting the 2015 will's execution, GayeLynne had the burden at trial to prove each of these elements. *See id.*

Exertion of undue influence cannot be inferred by opportunity alone. *Id.* at 923. There must be some evidence that the influence was not only present but was in

fact exerted in connection with the making of the will. *Id.* Although weakness of mind and body caused by infirmities of disease, age, or otherwise may be considered as material in establishing the testator's physical incapacity to resist or the susceptibility of his mind to an influence exerted, such weakness does not establish that his mind was in fact overpowered or subverted at the time the will was executed. *See id.* In most cases, the exertion of undue influence is subtle "and by its very nature usually involves an extended course of dealings and circumstances." *Id.* at 922.

But not every influence exerted by one person on another's will is undue. *Id.* Influence is not undue unless it destroys the testator's free agency and the testament produced expresses the will of the person exerting the influence. *Id.* Even if one requests, entreats, or importunes another to execute an instrument that makes a favorable disposition, the entreaties and importunities will not render the instrument invalid based on undue influence unless they were so excessive that they subverted the will of the maker. *See id.* Undue influence may be exerted—among other ways— through force, duress, intimidation, excessive importunity, or deception used to try to subvert or overcome the testator's will and induce the testator to execute the instrument contrary to his will. *Id.*

Because no two undue-influence cases are the same, the outcome of any case turns on its own unique facts. *Yost*, 534 S.W.3d at 525. Undue influence may be shown by direct or circumstantial evidence. *Rothermel*, 369 S.W.2d at 922. A single circumstance standing alone is insufficient to show undue influence, but several

circumstances, when considered together, may suffice. *See id.* But circumstantial evidence must do more than raise suspicion. *Id.* at 922–23. The distinction between evidence that suffices to show undue influence and that which is merely suspicious defies articulation; it essentially is a matter of degree. *Yost*, 534 S.W.3d at 525 (citing *Boyer v. Pool*, 280 S.W.2d 564, 566 (Tex. 1955)). If the circumstances are equally consistent with undue influence and its absence, then undue influence is not proved. *Rothermel*, 369 S.W.2d at 922.

GayeLynne contends that the 2015 will was the result of Tina's undue influence because at the time the will was executed, Michael was in physical and mental distress; Tina isolated Michael from GayeLynne and his sons; Michael was entirely dependent on Tina; Tina was directly involved in the planning, preparation, and execution of the will; and the will's property disposition was inconsistent with the 1998 will and was unnatural because is disinherited his wife and sons.

Michael was indisputably in a state of severe physical distress at the time the 2015 will was executed. Unable to move or speak, he was confined to a hospital room and was totally reliant on others. But there is no evidence that Michael was experiencing the type of "mental distress" that made him susceptible to undue influence. Michael had not suffered a head or brain injury, and as we detailed above, he was alert and lucid when he executed the will.

It is also undisputed that Michael was isolated from his wife and adopted sons. Tina admitted that she never informed GayeLynne, Kevin, or Jeremy about the

accident. GayeLynne did not find out that Michael was in the hospital until a friend told her on November 18, over a month after the accident. Before then, GayeLynne had unsuccessfully tried to contact Michael by calling friends, family members, hospitals, and the police. According to GayeLynne, during this time, Tina left her a telephone message "saying that Michael was perfectly fine."

After GayeLynne learned about Michael's accident, Tina told her that she was not allowed at the hospital and threatened to have her arrested if she came there. When Kevin and Jeremy went to visit Michael in the hospital sometime after November 18, Tina and Melissa told them that GayeLynne was not allowed to come to the hospital. GayeLynne never went to the hospital and had no contact with Michael before he died on November 26.

But Michael's isolation from GayeLynne and his sons and his leaving them out of the 2015 will is not altogether surprising. At the time of the accident, he and GayeLynne (his adopted sons' biological mother) were separated, and they were in the middle of a contested divorce. Despite GayeLynne's testimony that at the time of the accident she and Michael were considering reconciling, there was evidence that the divorce was contentious. And when Michael was admitted to the hospital, he made clear to hospital staff that he did not want GayeLynne making medical decisions for him, explicitly telling staff that he wanted his daughters or his sister to do so.

Contrary to GayeLynne's assertions on appeal, Tina was not "directly involved in the planning, preparation[,] and execution of the 2015 will." Tina contacted Ferrier

and provided information about Michael's family to Ferrier,[17] but she was not involved in the will's preparation and execution. As explained above, Ferrier met with Michael privately to discuss the will, and Michael made clear to Ferrier that he did not want GayeLynne, Kevin, and Jeremy to inherit. Indeed, his will states that he is "specifically not making any provisions for [GayeLynne] in this Will because [they] are in the process of divorcing." Tina was not present when Ferrier drafted the will, when he walked through it with Michael, or when the will was executed.

Viewing the evidence under the applicable standards of review, we hold that there is some evidence to support the jury's no-undue-influence finding and that the jury's failure to find undue influence is not against the great weight and preponderance of the evidence.

## III.
## Dowdy's Appeal[18]

Dowdy also raises three issues: (1) the newly elected successor judge (Judge Johnson) lacked authority to set aside the jury's finding that GayeLynne did not act in good faith and with just cause in seeking to have the 1998 will admitted to probate; (2) alternatively, the trial court erred by setting aside that jury finding; and

---

[17]Ferrier admitted that he knew Michael's family and was familiar with some of Michael's assets because he had done some estate planning for another family member (not Tina) and because Tina's daughter-in-law had worked as his paralegal.

[18]As noted, Dowdy replaced Tina as the appellee / cross-appellant in this appeal. Because we have not heard otherwise, we assume that Dowdy is continuing to prosecute the issues that Tina raised in her cross-appeal.

(3) alternatively, the trial court erred by awarding attorney's fees to GayeLynne but not to Tina.

As noted, GayeLynne timely filed a postjudgment motion asking the trial court to, among other things, set aside the jury's adverse good-faith-and-with-just-cause finding on no-evidence grounds and to enter judgment awarding her attorney's fees. Judge Johnson granted the motion only as to that finding and determined that GayeLynne was entitled to attorney's fees. *See* Tex. Est. Code Ann. § 352.052(a) (providing that an executor who in good faith and with just cause tries to probate a will is entitled to recover her attorney's fees from the estate even if the executor failed in probating her proposed will). Judge Johnson later signed an order awarding GayeLynne about $200,000 in attorney's fees and expenses.

## A. Judge Johnson had authority to set aside the jury finding.

In his first issue, Dowdy contends that Judge Johnson lacked authority to set aside the jury's good-faith-and-with-just-cause finding against GayeLynne because Judge Johnson did not preside over the trial. For support, Dowdy relies on *Ad Villarai, LLC v. Pak*, 519 S.W.3d 132 (Tex. 2017).

The issue in *Pak* was whether a newly elected district-court judge or the former judge she replaced could enter findings of fact following a bench trial over which the former judge had presided before his term expired. *Id.* at 134. As relevant here, the supreme court held that because successor judges do not have inherent or statutory authority to file fact findings on behalf of predecessors displaced by an election, any

39

fact findings made by successor judges are void.[19] *See id.* at 137–40. Based on this part of the court's holding in *Pak*, Dowdy argues that because fact findings after a bench trial have the same force and dignity as a jury's findings, a successor judge who replaces a predecessor judge after an election has no authority to set aside a jury verdict or rule on any undisposed motions. *See id.* at 140.

But we do not read *Pak* to extend that far. First, *Pak* was limited to findings of fact, *see id.* at 135, n.1, and did not address a successor judge's authority to rule on any undisposed motions or to set aside a jury finding. Second, a successor judge's making fact findings based on evidence she did not hear is not equivalent to a successor judge's ruling on a motion to set aside a jury finding. The former involves fact-finding; the latter does not.

A trial court may disregard a jury verdict and render judgment notwithstanding the verdict (JNOV) if no evidence supports one or more of the jury's findings or if a directed verdict would have been proper. *See* Tex. R. Civ. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Fort Bend Cty. Drainage Dist. v. Sbrusch*, 818 S.W.2d

---

[19]In reaching this holding, the supreme court determined that civil-procedure rule 18—which gives some authority to a successor judge when her predecessor dies, resigns, or becomes disabled—does not apply when the predecessor has been displaced by an election. *Pak*, 519 S.W.3d at 138–39. The court also determined that neither the civil-procedure rules governing findings (rules 296 and 297) nor civil practice and remedies code section 30.002—which grants a former judge the authority to file fact findings and legal conclusions and permits a successor judge to do the same but only if the former judge dies before doing so—permits a successor judge to file findings. *Id.* at 139–40; *see* Tex. Civ. Prac. & Rem. Code Ann. § 30.002 (West 2015); Tex. R. Civ. P. 296, 297.

392, 394 (Tex. 1991). A directed verdict is proper only under limited circumstances: (1) when the evidence conclusively establishes the movant's right to judgment or negates the opponent's right; or (2) when the evidence is insufficient to raise a material fact issue. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 454 (Tex. App.—Fort Worth 2009, pet. denied) (op. on reh'g).

"A judge may . . . make substantive legal decisions in a case where he did not preside over some or all of the trial so long as the decision does not require the judge to find facts based on evidence he has not heard." *Masa Custom Homes, Inc. v. Shahin*, 547 S.W.3d 332, 336 (Tex. App.—Dallas 2018, no pet.) (citing cases). When ruling on a motion to set aside a jury finding, a trial court is determining whether, *as a matter of law*, the evidence conclusively establishes the movant's right to judgment or negates the opponent's right or whether the evidence is sufficient to raise a fact issue. In the process of doing so, the trial court is not asked to find facts. Accordingly, we conclude that Judge Johnson had the authority to set aside the good-faith-and-with-just-cause finding against GayeLynne and therefore overrule Dowdy's first issue.

**B. Judge Johnson erred by setting aside the jury finding.**

As part of his second issue, Dowdy alternatively argues that even if Judge Johnson had authority to set aside a jury finding, she erred by disregarding the jury's good-faith-and-with-just-cause finding against GayeLynne. We agree.

41

To determine whether the trial court erred by rendering a JNOV, we view the evidence in the light most favorable to the verdict under the well-settled standards that govern legal-sufficiency review. *See Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009); *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003). We must credit evidence favoring the jury verdict if reasonable jurors could and must disregard contrary evidence unless reasonable jurors could not. *See Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009); *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007).

A party with the burden of proof at trial is entitled to JNOV on a particular issue only if the evidence establishes that issue as a matter of law. *Henry v. Masson*, 333 S.W.3d 825, 849 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (citing *Cain v. Pruett*, 938 S.W.2d 152, 160 (Tex. App.—Dallas 1996, no writ)). A trial court may not set aside a negative jury finding and substitute its own affirmative finding unless the evidence conclusively establishes the issue. *See Tanner*, 289 S.W.3d at 830. Because good faith is ordinarily a fact question for the jury to decide based on the case's circumstances, we must uphold a jury finding that the party did not try to probate a will in good faith unless the evidence conclusively establishes the party's good faith. *See Yost*, 534 S.W.3d at 529; *see also Ray v. McFarland*, 97 S.W.3d 728, 729–30 (Tex. App.—Fort Worth 2003, no pet.).

The jury charge defined "good faith" as "an action that is prompted by honesty of intention or a reasonable belief that the action was probably correct," and "with

42

just cause" as meaning that "the actions were based on reasonable grounds and there was a fair and honest cause or reason for the actions." GayeLynne testified that she gave "no validity or credence" to her husband's drafting the 2015 will and that she believed that the 1998 will—under which she was the only beneficiary—was Michael's last will and testament.

But as we have explained in detail, at the time of the 2015 will's execution, GayeLynne and Michael were in the process of divorcing. Michael's medical records—all of which GayeLynne stated that she had read before trial—reflected that, when Michael was admitted to the hospital a week before the will's execution, he told hospital staff that because of the divorce, he did not want GayeLynne to make decisions for him and wanted his daughters to do so. His medical records also reflected that he had not suffered any brain or head injury because of the accident and that when the will was executed, Michael was alert and oriented as to person, place, and time and had not had any pain medication for several hours. The jury also heard videotaped deposition testimony from four witnesses regarding the drafting and execution of the 2015 will and Michael's testamentary capacity.

This evidence (of which GayeLynne was aware before trial) is some evidence to support the jury's finding that GayeLynne did not act in good faith in trying to have the 1998 will admitted to probate, and we certainly cannot say that GayeLynne conclusively proved the opposite. Accordingly, the trial court erred by disregarding the jury's good-faith-and-with-just-cause finding against GayeLynne and by implicitly

43

finding that she acted in good faith and with just cause to be entitled to an award of attorney's fees and expenses for probating the 1998 will. We thus sustain this part of Dowdy's second issue, which is dispositive of his appeal.[20] *See* Tex. R. App. P. 47.1.

## IV.
## Conclusion

Having overruled Dowdy's first issue and sustained the dispositive part of his second, we (1) reverse the part of the trial court's March 7, 2017 order modifying the trial court's December 22, 2016 judgment by setting aside the jury's good-faith-and-with-just-cause finding against GayeLynne and awarding her an unspecified amount of attorney's fees; (2) affirm the remainder of the trial court's March 7, 2017 order; (3) reverse the trial court's October 30, 2017 order awarding GayeLynne $199,653.66 in attorney's fees and expenses; and (4) affirm the trial court's October 27, 2017 and October 31, 2017 orders denying Tina's request for attorney's fees and

---

[20]Because we hold that the trial court erred in setting aside the jury's good-faith-and-with-just-cause finding against GayeLynne, we do not address the other part of Dowdy's second issue: that Judge Johnson erred by failing to state any basis to support her order setting aside that finding. Nor do we address Dowdy's third issue in which he complains that if Judge Johnson had authority to disregard the jury's good-faith-and-with-just-cause-finding against GayeLynne and to award GayeLynne attorney's fees and expenses, Judge Johnson abused her discretion by not also awarding Tina—as the executor designated in the 2015 will—attorney's fees and expenses under estates code section 352.052(a). *See* Tex. Est. Code Ann. § 352.052(a). Because Dowdy does not assert that Tina was entitled to attorney's fees and expenses under section 352.052(a) independent of such an award to GayeLynne under that section, we will not address Dowdy's final issue.

44

expenses as the executor designated in the 2015 will. Having overruled GayeLynne's issues, we affirm the trial court's December 22, 2016 judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: November 15, 2018